UNITED STATES of America

v.

Benjamin LADMER et al., Defendants.

No. 74 C 274.

United States District Court,
E. D. New York.

March 9, 1977.

Fred F. Barlow, Brooklyn, N.Y. (David G. Trager, U.S. Atty., and Charles L. Weintraub, Brooklyn, N.Y., of counsel), for plaintiff.

Harold Dublirer, New York City (Dublirer, Hayden & Straci, New York City, of counsel), for defendants.

## MEMORANDUM incorporating FINDINGS OF FACT and ORDER FOR JUDGMENT

DOOLING, District Judge.

The present civil action against members of certain labor unions or labor organizations, brought pursuant to 18 U.S.C. § 1964, . . . arose out of expenditures incurred in connection with conventions of the International Production, Service & Sales Employees Union ("IPSSEU") held at the Fontainebleau Hotel in Miami in 1968 and at Hilton Hawaiian Village in 1970.

Defendants Ladmer, Goldstein, Selvaggi and Rao were officers of International Production, Service and Sales Employees Union ("IPSSEU") and of certain of its Locals. Defendant Ladmer was president of Local 222, defendant Goldstein was president of Local 517 and defendant Selvaggi was secretary-treasurer of Local 106. Defendant Rao was secretary-treasurer of IPSSEU. Defendants, Ladmer, Goldstein and Selvaggi, as officers of their respective Locals, were also vice-presidents of IPSSEU and were members of the executive boards of their respective Locals. Defendants Ladmer, Goldstein and Rao were trustees of the IPSSEU Welfare Fund and defendant Rao was administrator and trustee both of the Welfare Fund and of the IPSSEU Pension Fund. The defendant Ronald Straci did not hold office either in IPSSEU or in any of the Local unions or in either fund. At the times in question he was a lawyer . . .

The complaint in the action charged the present defendants . . . in one count framed under 18 U.S.C. § 1964. The complaint charged that from November 6, 1967 until February 17, 1971, the defendants, being employed by and associated with IPSSEU, a trade union and labor organization affecting Interstate Commerce, "unlawfully, wilfully and knowingly," conducted and participated, directly and indirectly, in the conduct of the affairs of IPSSEU and six of its Locals "through a pattern of racketeering activity, to wit, a series of acts involving embezzlement from union funds" and welfare and pension funds, in that they (a)

unlawfully and wilfully embezzled, stole, abstracted and converted to their own individual and collective uses, and to the uses of others, funds of IPSSEU and the Locals and in that they aided and abetted others in committing such acts; and (b) embezzled, stole and unlawfully and wilfully converted to their own uses and uses of others funds of the IPSSEU Welfare and Pension Funds (29 U.S.C. § 501(c) and 18 U.S.C. § 664.) The complaint further alleged that the acts allegedly so committed by the defendants constituted violations of 18 U.S.C. §§ 1961(1)(A) and 1962(c). Plaintiff prayed judgment (a) enjoining the defendants from directly or indirectly engaging in trade union or labor organization activities, (b) divesting each defendant from all interests of any kind in IPSSEU and its Locals, (c) divesting each defendant from all interests of any kind in any other trade union or labor organization, (d) directing each defendant to submit such information as the Court from time to time found necessary and proper to carry out the purposes of 18 U.S.C. § 1964, and (e) for further relief.

Both 29 U.S.C. § 501(c), relating to embezzlement from union funds, and 18 U.S.C. § 664, relating to embezzlement from employee pension and welfare funds, are included in the definition section of Chapter 96 of Title 18 ("Racketeer Influenced and Corrupt Organizations"). The term "racketeering activity" is defined by Section 1961(1)(B), (C) as meaning any act "which is indictable under any" of a number of sections of Title 18 and other Titles, including Title 18 "section 664 (relating to embezzlement from pension and welfare funds)," and Title 29 "section 501(c) (relating to embezzlement from union funds)."

The complaint charges violation of Section 1962(c) which so far as presently relevant reads

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .."

Section 1961(5) provides:

"'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . after the commission of a prior act of racketeering activity;"

The embezzlement section of Title 18 referred to in the indictment and in Section 1961 is Section 664 which provides:

"Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use or to the use of another, any of the moneys, funds . . or other assets of any employee welfare benefit plan or employee pension benefit plan, or any fund connected therewith shall be fined . . . or imprisoned . . . or both."

The crime is a felony.

The embezzlement section in Title 29 referred to is Section 501(c). Section 501 defines the fiduciary responsibilities of officers of labor organizations. Subdivision (a) makes it the duty of officers of labor organizations to hold its money and property "solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and by-laws and any resolutions of the government bodies adopted thereunder"; self-interested transactions with the union are forbidden, as is the holding of any interest that conflicts with that of the union; officers must account to the union for any profit received by them in whatever capacity in connection with transactions conducted by them or under their direction for the union. Subsection (a) concludes with the statement that

"A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a government body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy."

Subsection (b) of Section 501 provides that when any union officer is alleged to have violated his subsection (a) duties, and the union, its governing board, or its officers refuse or fail to sue or recover damages or an accounting or other appropriate relief within a reasonable time after being asked to do so by a union member, the member may sue in any United States district court or in any State court for damages or an accounting or any other appropriate relief. However, the proceedings may not be brought except upon leave of court obtained upon a verified application and for good cause shown. A part of any recovery may be used to pay counsel fees and expenses of the member initiating the suit.

Subsection (c) of Section 501 then provides

"Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds . . . or other assets of a labor organization of which he is an officer . . . directly or indirectly, shall be fined . . . or imprisoned . . . or both."

The offense is a felony.

The challenge of the complaint and of the Government's evidence is directed at the expenditures of union funds made by defendants at IPSSEU conventions held in Miami in March 1968 and in Honolulu in September 1970. In particular the Government attacks the *per diem* expenses of defendants' overstaying the time actually taken up by convention business in Miami, the expense of dinners given in Miami and in Honolulu to the delegates and their wives each evening after the completion of convention business and without any business occasion other than the recreational value argued to flow from such entertainment, money expended for meals and beverages for delegates for whom *per diem* provision had been made, expenses for hired cars incurred without business need for the delegates at the conventions, and in the case of the Honolulu convention, the granting of cash advances in the amount of the first-class round trip air fare to Honolulu to the delegates although in fact they travelled in tourist class accommodations. In the case of the Honolulu convention the Government charges further that the convention was wholly unnecessary.

Defendants protest that they are being singled out and charged with embezzlement for doing what is a wide-spread custom not only of business but of other labor unions, and, among other things, they argue that all the expenditures involved were authorized or ratified or both by the interested labor organizations, and that, even if such use of union funds for entertainment expense and the like could be characterized as embezzlement within the meaning of the statutes involved, it cannot, in any common sense interpretation of the statute, be said that because of these acts connected with the two conventions, the defendants have conducted or participated in the conducting of the affairs of IPSSEU and the four Locals through a pattern of racketeering activity comprised in acts of embezzlement. Plaintiff on the other hand insists that the statute here involved be read, not as characterized for all purposes by the word "racketeer" and the words "corrupt organizations" in the title of Chapter 96 of Title 18, but in terms of the particular provisions of the statute and their allegedly precise application to the activities which it has challenged.

The constitution of IPSSEU and the constitution and bylaws of the several Locals involved throw some light on the issues involved. Article V of the IPSSEU constitution provides that the International Union is to meet every five years on the second Monday in February at such place as the preceding general convention has designated, and that a special convention may be called either by the general executive board or by a two-thirds vote of all voting members on the petition of three Locals. The paragraph providing for a special convention continues

". . . and the expenses shall be defrayed by a special assessment levied by the General Executive Board. The date

and place shall be set by the General Executive Board."

Article 6 of the Constitution provides for representation at conventions. Representation is made to depend on the number of members in the Local. . . . Representation at the convention may not be by proxy. Sessions of the convention may be attended only by duly accredited delegates and by the general officers and international representatives and organizers.

Article 7, Section 2 provides that whenever the president or the secretary-treasurer is required to perform services away from union headquarters they shall be allowed in addition to their salary first class transportation by the shortest road to and from their destinations and actual out-of-town expenses such as hotels and sundries. The officers of the International hold office for five years or until their successors are duly elected and certified. The officers are to be elected by the delegates at the convention on its last day.

Under Article 14 of the IPSSEU constitution there is a general executive board of 15 members consisting of the president, the secretary-treasurer, the recording secretary and the vice-presidents of the 12 Locals included in the IPSSEU International. The General Executive Board has full power between conventions to make such laws as may be needed in the interest and for the benefit of the International and those laws continue in effect unless reversed at the next convention.

Under Article 14, Section 4 of the IPSSEU constitution, the General Executive Board has the power to authorize the secretary-treasurer

". . . to expend such sums of money from the funds of the organization as may be necessary to continue the conduct of the business of the International Union, such as payment for services of employees, and representatives, officers and organizers, counsel, accountant and special assistance when necessary, and any and all expenditures that may be deemed necessary in the discretion of the General Executive Board."

The General Executive Board is to meet every three months and must meet not less frequently than every six months. Under Article 14, Section 14, the General Executive Board is to budget the income of the International Union to cover all expenditures in the operation of the International Union including those of the General Executive Board.

The constitution and bylaws of the Locals involved are all very much the same. . . . Under Article VII of each local constitution the secretary-treasurer has the duty of handling the financial affairs of the Local and all checks and vouchers have to be signed by the president and the secretary-treasurer, both of whom must be bonded at the cost of the Union. Article VII provides that

"The Executive Board shall have full and complete power to conduct the business of the Union and to make such decisions as may be expedient for the Union in its own judgment."

Two general membership meetings must be held each year.

IPSSEU was and is essentially a regional International. Its constituent Locals had shops in Nassau, Suffolk and Westchester Counties, and by virtue of having organized Masters, had a shop or two in Puerto Rico and some shops in Connecticut and New Jersey.

On November 6, 1967, the IPSSEU Executive Board unanimously adopted a motion of defendant Ladmer that a convention be held in March 1968 in Puerto Rico or Miami Beach, Florida, and that convention expenses for the President, Secretary-treasurer and duly elected delegates of the various Locals be paid at the rate of $50 a day plus $30 a day toward the cost of a single hotel room, and the cost of one first-class round trip airplane ticket. In early January 1968, the Executive Boards of Local 106, Local 222, and Local 517 "authorized convention expenses" as follows:

"All expenditures to be incurred by the Delegates attending the convention of the [IPSSEU] to be held at the Fontaine-

bleau Hotel, Miami Beach, Florida in March 1968 were unanimously approved." On January 10th the IPSSEU Executive Board voted unanimously to have its convention at the Fontainebleau Hotel of Miami in Miami Beach, Florida, "from March 1 to the 7th, 1968." . . .

It is overwhelmingly evident that there was no proportion between the costs incurred by the Locals to conduct the convention in Miami and either the amount of actual business transacted during the convention or the costs that would have been incurred if the convention had been conducted at Union headquarters in Brooklyn or at least in the region in which the labor organizations were primarily active, and if the convention had been organized with a view to minimizing expense. The choice of Miami as a place to hold the convention, the manner in which it was conducted, the recreational dinners, the furnishing of rented automobile use, and the apparently needless protraction of the stay in Miami were not directly related to the business of any of the Union organizations and were not necessary for the conduct of the Union business. The justification for such a convention and its accompaniments must rest on some other and more indirect advantage to the Labor organizations that could yet be found to be demonstrable and not merely fanciful.

There is no evidence that the defendants who were at the Miami convention and participated in the arrangement for it did so with any specific consciousness that what they were doing was questionable unless what must be found to be the inadequacy of record keeping and reporting can be taken to suggest a consciousness of impropriety. There is uncertain evidence that General Counsel for the labor organizations had at least orally indicated that he thought there was no impropriety in having the conventions so far from the area in which the Locals operated or in the several Locals' giving of dinner parties on successive nights to all of the delegates. Nevertheless it is clear that the defendants involved with the Miami convention were under no misapprehension about the facts. They necessarily knew that the ratio of business to pleasure was very low indeed and that the labor organizations were paying the costs of both.

After the completion of the convention, on March 12, 1968, the Executive Boards of Locals 222 and 517 at their respective meetings adopted minutes which "ratified" the expenses involved in the following language:

" . . . all expenditures for attendance of delegates including a dinner run by the Local during the convention were unanimously approved."

The final authorizations, and the Local ratifications of the expenditures, were not actions taken at meetings of the Local memberships, and the general approval of convention expenses adopted on March 2, 1968, in Miami was of necessity adopted by beneficiaries of the expenses there in question. While delegates elected by the membership of the Locals were present and could have expressed the "rank and file" point of view, it would be asking much to expect of them or of the other delegates that they would challenge any part of the expenses. Similarly, the votes taken before and after in the Local were votes taken unanimously by the members of the Executive Boards of the Locals some at least of whom were to be or had been delegates to the convention. The membership would not have seen the minutes except as they were available for inspection at the regular membership meetings of the Local. Those meetings, the evidence is, were sparsely attended.

A special convention was held in July 1969 at the Concord Hotel, Kiamesha Lake, New York, for the stated purpose of choosing a successor to Frank A. Tortorici who had, until his death, been the general secretary-treasurer of IPSSEU. He was succeeded in that office by the defendant Robert Rao. Under Article XIV, Section 12, of the constitution of IPSSEU the General Executive Board was explicitly empowered to fill a vacancy occurring in the office of general secretary-treasurer until the next convention and was required to do so within

thirty days after the vacancy occurred. Mr. Tortorici had died on May 25, 1969. . . Rao was selected by the Executive Board and the July Kiamesha Lake convention was set up and conducted with no purpose, so far as the evidence shows, except to elect defendant Rao to the office of General Secretary. Yet he seems to have been elected only for a term ending December 31, 1970, rather than for a term ending in early 1973, when the next regular convention would be held.

The occasion for conducting a general convention of IPSSEU in Hawaii in 1970 was, as stated at the IPSSEU Executive Board meeting of September 10, 1970, *first,* to conduct an election for the position of general secretary-treasurer, and *second,* to consider the constitution of IPSSEU, which was being reviewed, corrected and revised by General Counsel. The stated reason and professed justification for holding the convention in Hawaii was "to avoid extra expenses", since the Annual Conference of the National Foundation of Health, Welfare and Pension Plans was scheduled to be held in Hawaii at the Hilton Hotel in Honolulu from December 5 to December 9, 1970. The implication was that much the same men would be going both to the Foundation meeting and to the convention. The evidence does not show that there would be a substantial identity between the persons who would have been appropriate for the Foundation Conference and those who were delegates to the convention.

The decision to hold a convention in Honolulu was evidently made soon after the date and place of the Foundation Conference was set but final action was not taken until meetings of the Executive Boards of IPSSEU and the Locals during the first two weeks of September 1970. The travel and hotel accommodations were arranged for early in the year for the trustees directly interested in the Foundation Conference and in latter July the arrangements were made for the other delegates who were to attend the IPSSEU convention to be held at the same time and place. . . .

There were 22 persons present at the hotel in Honolulu, including, in addition to the president and secretary-treasurer of each Local, one delegate from each of Locals 422, 517, 719 and 815, the three principal officers of IPSSEU (the President, secretary-treasurer and recording secretary and the assistant recording secretary) plus, as counsel, Charles Hayden and Ronald Straci.

Meetings of the convention delegates were held on November 30, December 1st, December 2d, and December 3d. . . . A full slate of officers, including vice-presidents, was nominated at the November 30th meeting and elected at the December 2d meeting. Horowitz was re-elected president and Rao secretary-treasurer. At the meeting on December 1st the revised constitution was discussed and adopted over the objection of the defendant Ladmer. Defendants Rao, Goldstein, Ladmer and Arthur Wise were designated a committee to act as a Committee of the Constitution. On December 3d the officers were installed . . . . Horowitz did not resign the presidency at the convention, nor was provision made for a successor. . . .

What has been said of the Miami convention is true and more than true of the Honolulu convention. The choice of location for the convention, unless viewed in relation to the Foundation Conference, must be considered an unreasonable choice, and the assigned reasons for choosing to hold a convention, inadequate to support the choice. There was no occasion for nominating and electing a complete slate of officers and vice-presidents; the terms of most of them were not to expire for three years, and the predicted resignation of Horowitz did not take place. If organization politics had dictated an eighteen month term for Rao ending with 1970—and the evidence warrants the finding that there was no political problem at all—there was no justification for ignoring the second time the explicit authority granted to the Executive Board by Article XIV, Section 12, to fill vacancies until the next convention. Indeed, the difference in membership between

the Executive Board of IPSSEU and those persons who attended conventions was not great enough to give the convention vote to fill out defendant Rao's term any distinct significance.

Again there is no positive evidence that the delegates to the convention, including the defendants and Mr. Straci, went on the convention trip in any consciousness of wrongdoing of a definable sort. But necessarily each of them was aware that they were a very long distance from home, and that there was an opulence of removal from the day to day concerns of the labor organizations and the sober realities of Union meetings that had no foundation in any considerations relevant to the work to be done at even a properly called International convention. The seeming justification of coincidence with the Foundation Conference is of no evidentiary value. The holding of that Conference at Honolulu should rather have raised with IPSSEU the question whether anything that could be accomplished at the Conference could warrant the expense of sending any—and, if so, how few—of the persons charged with responsibility for the Welfare and Pension Funds. . . . The evidence is that few receipts covering the convention expenses incurred were retained in the records of the labor organizations, although all checks were retained and accounting records of an appropriate sort were maintained by the labor organizations. (See 29 C.F.R. § 486.1 *et seq.*) There was testimony that administratively the Department of Labor considered that proper expenses incurred by a labor union for the entertainment of delegates, their wives and families should be reported in the Annual Reports on Form LM–2 Reports at Item 58 "Office and Administrative Expense" under the category "Disbursements" in the "Statement of Receipts and Disbursements". If so, then there are indications in the LM–2 Reports of a different interpretation by certain of the labor organizations here involved. . . .

The conclusion drawn from the LM–2 Reports filed, and from the instructions provided to the Labor Organization, is un-

certain. The Department of Labor is certainly aware that many Unions do have conventions and that they are occasions of very considerable expenditure, inevitably, and even if conducted on conservative lines. Yet nothing in the instructions for Form LM–2 mentions the word "convention". While the evidence is that one accounting firm and one lawyer advised all four of the Labor Organizations here involved, it appears that in the reports on LM–2 for the year ended February 29, 1968, IPSSEU reported $5,160 of convention expense and Local 222 reported $3,659 of such expense, and Locals 106 and 517 did not use the word "convention" or the words "convention expense" in their reports. None of the Labor Organizations in the reports covering the years of the convention at Kiamesha Lake and the convention in Honolulu reported any amount as expended for a convention or as convention expense. For the year ended February 29, 1972, IPSSEU did report $162 of convention expense and Local 106 reported $599 of such expense. The inconsistency in the reports of the Miami convention expense among the Labor Organizations is seen as carelessness and loose practice rather than as any effort to conceal the existence of the Miami convention expenses and the total amount of them. However, the two organizations that reported convention expense did disclose the particulars.

One clear conclusion to be drawn from the reports is that the report form is not adequately framed to elicit data from convention expense, an arguably conspicuous type of expense. A second conclusion that may be drawn is that, while the method of reporting and the contents of the reports, with all their inconsistencies, would not, standing alone, suffice affirmatively to demonstrate calculated concealment, they do when taken in conjunction with the deficiency in record retention and other evidence, afford ground for inferring a consciousness of irregularity. A third conclusion is that the method of reporting, with its inconsistencies combined with the record keeping deficiencies, would not bear the burden of proving consciousness of wrong-

doing of the kind which must be shown here.

The parties have stipulated that IPSSEU and Locals 106, 222, 422, 517, 719 and 815 were Labor Organizations engaged in an industry affecting commerce within the meaning of 29 U.S.C. § 402(c) and (i) and were enterprises engaged in, or the activities of which affected, Interstate Commerce, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

■ The first critical question is whether what was done can be characterized as embezzling or stealing or unlawfully or willfully abstracting or converting to one's own use money or funds of a Labor Organization. To make out that offense it is not necessary to show the equivalent of a larceny followed by use of the funds for wholly private purposes dissociated from Union activity. See *United States v. Santiago*, 2d Cir. 1976, 528 F.2d 1130, 1135. It is settled too (*United States v. DiBrizzi*, 2d Cir. 1968, 393 F.2d 642, 645) that personal non-business expenses not incurred in any way to further the Union's business, which, to the knowledge of the one incurring the expense, are paid with Union funds, may be found by the trier of the fact to be willful conversions of Union funds, notwithstanding the fact that the payments were authorized and adopted by the Union. The Court said that "the reach of § 501(c) is not limited to Union officers who engage in stealthy larcenies or devious embezzlements but extends to an officer who 'unlawfully and willfully abstracts or converts to his own use' the funds of a labor organization." The Court said (393 F.2d at 645):

"When one sends the union a voucher known to be an improper one, and then receives payment of the voucher, the crime is completed."

■ Not every expenditure of Union funds for the use of another is necessarily a conversion. The indirect and possibly debatable advantage to a Union of making a campaign contribution is such an expenditure as the Union can authorize and make. *United States v. Silverman*, 2d Cir. 1970, 430 F.2d 106, 115, 127. As Judge Friendly has pointed out (*United States v. Silverman, supra*, 430 F.2d at 126–127), the language used in 18 U.S.C. § 664 and 29 U.S.C. § 501(c) is the language of a series of long familiar embezzlement statutes, and the language warrants the inference that although the statutes "have gone beyond the common law offense of larceny and the old statutory crime of embezzlement because 'gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches,' *Morissette v. United States*, 342 U.S. 246, 271–272, 72 S.Ct. 240, 96 L.Ed. 288 . . . .' ", nevertheless Congress subjected Union officers and employees only "to the same test of criminal liability as government employees, bank officers and the like—not to a lower one." Judge Friendly explained (430 F.2d at 127)

". . . the claim is that [defendant] unlawfully and willfully converted monies· to the use of another. It is easy to understand how a union employee does this when he 'unlawfully and willfully' uses union funds in a manner that works to the personal benefit of himself or the payee and does not benefit the union, whether or not the union went through the form of authorization; the 'union' presumably would have objected if it had been able to speak freely. Such was this court's holding in . . . *DiBrizzi* . . . . .. But, . . . that is not this case, since the unions' constitutions contemplated financial contributions in support of the campaigns of political candidates."

Judge Friendly intimated a doubt that a conviction under Section 501(c) could be made out by demonstrating a fraudulent intent to deprive the Union of its funds and *either* a lack of *bona fide* authorization *or* an absence of benefit to the Union from the expenditure, and Judge Friendly considered it

". . . doubtful whether a payment made in a bona fide belief that it was for a union's benefit and that it had been authorized or would be ratified can ever be swept under 29 U.S.C. § 501(c)." 430 F.2d at 117, 127.

In spite of *United States v. Goad*, 8th Cir. 1974, 490 F.2d 1158, 1164–1165, which in substance took the view that Section 501(c) proscribed payments that were made either without benefit to the Union or without authorization, relying in part on the dissenting segment of Judge Moore's opinion in *Silverman*, the Court in *United States v. Ottley*, 2d Cir. 1975, 509 F.2d 667, 670–671, reached a different result. Ottley was charged with aiding and abetting the union secretary-treasurer in embezzling union funds by leasing for the secretary-treasurer and maintaining at union expense an automobile which in fact was used almost entirely by the secretary-treasurer's wife for family purposes. There was evidence from which the jury might have concluded that the defendant thought that the secretary-treasurer used the automobile for union purposes, and the union did lease a number of automobiles for its business agents which were and were meant to be used in union affairs and union work. There was no specific authorization in the union records either for the secretary-treasurer's car or for those used by the business agents. A verdict against defendant was set aside because the charge authorized the jury to convict even if they found either that the expense for the secretary-treasurer's car had been authorized by prescribed union procedures, or that "the defendant believed in good faith that he had authority to make that expenditure."

The Court of Appeals, relying on Judge Friendly's analysis in *Silverman*, said (509 F.2d at 671):

"If Ottley in good faith believed that [the secretary-treasurer's] automobile was being used for union business *and* that the union had authorized the expenditure or would ratify it, he did not violate section 501(c)."

The Court distinguished *Goad, supra*, on its facts as presenting an "unlikely situation for a credible defense of good faith belief that the expenditures benefited the Union and that the membership would have ratified the increases if asked to." The Court pointed out that in the case before it many other cars leased by the union were for the *bona fide* use of the business agents in Union business—a situation in which it was reasonable to suppose that the membership would approve the expenditure. But the Court noted (509 F.2d at 671–672):

"Some expenditures are so clearly personal in nature that such a claim [—that the expenditure would have been approved had the official asked the union to do so—] is scarcely credible. Other expenditures—like providing an automobile for another union official—are not so clearly personal, and it is in just such a gray area that we must be careful not to 'enlarge the reach of enacted crimes' by unduly narrowing the concept of criminal intent."

(The language in the inner quotation is from *Morissette, supra*, 342 U.S. at 263, 72 S.Ct. 240.)

*Ottley* was discussed but not really followed in *United States v. Nell*, 5th Cir. 1976, 526 F.2d 1223, 1232, where the Court in substance followed *Goad*, indicating that a case under Section 501(c) would be made out by showing either lack of union benefit or absence of authorization.

■ Turning then to the facts in the present case, and considering first the Miami convention of 1968, it must be concluded that the Government has not borne the burden of proving that the expenditures complained of amounted to misuse of Union funds within the meaning of Section 501(c). There is evidence that counsel approved the choice of site and of the dinners both orally and by his attendance at the expense of the labor organizations. IPSSEU and one of the Locals, perhaps without giving detail, at least disclosed in their LM–2 reports the amount of their convention expenditures and the LM–2 form and instructions are confusing enough so that it is understandable that they did not detail separately the amounts paid out for the recreational dinners, the Hertz cars and the overtime stay at Miami. It is not possible to find that the delegates believed that going to dinners together with their wives, or doing some sightseeing in Hertz cars, or staying an

extra day benefitted the Union. Their thought at best could have been no more than that the Union did not begrudge them such enjoyments or would not have begrudged them. It is easy to believe, perhaps they found it easy to believe in a vague way union affairs run a little more smoothly for such an occasional, say, pleasurably gregarious outing, without cost to the delegates attending. There is no evidence that any of the delegates were attending or that the defendants involved were attending and participating believing that what they were doing was neither authorized nor likely to be authorized if disclosed to the labor organizations. It is difficult to resist the conclusion that the delegates were simply availing themselves of what was considered a perquisite of position.

■ That scarcely meets the affirmative elements of the language in *Silverman* and *Ottley*: that language would rather require in addition to innocence, a good faith belief that the union was benefitting and that it had authorized or would, if asked, ratify what was done. But something more, it would seem, than an absence of good faith belief in union benefit would seem to be requisite to justify characterizing the conduct at the Miami convention as criminal misconduct. What is involved is a felony, punishable by as much as five years imprisonment when the case is brought on the criminal side. The civil prosecution requires proof of the same essential elements although, it is assumed, by the lesser standards of proof usual in civil cases. So much of *Silverman* and *Ottley* as indicates that the expenditure must be for the benefit of the Union or believed to be such emphasizes one aspect of proper expenditure, an expenditure that manifestly advantages the union. There are certainly other expenditures that are appropriate in union affairs although not self-evidently beneficial to the union, except in some extended sense of the word beneficial. Here the evidence permits an inference that the delegates, and the defendants involved, did not think they were acting inappropriately in acting as they did. That may well be a commentary

on the customs of the age, but it does not mark the participants in the Miami convention as criminals for having done so, for having improved the occasion with some extras of pleasure that could hardly be thought ordinary and necessary expense of conducting union affairs. That the expenditures could have been defended in a civil suit for an accounting is not necessary to decide; it is more than evident that the issues in such a suit would be radically different and might be decided quite the other way. But what the age tolerates is not what it must or should continue to tolerate.

■ On all of the evidence it is not possible to reach the same conclusion with respect to the 1970 convention in Honolulu. The evidence supports only the conclusion that there was no genuine controversy over the successorship to the office of general secretary-treasurer and that if the Kiamesha Lake convention was necessary, and even now that is not demonstrable, the Honolulu convention was certainly wholly unnecessary. The matter of revising the constitution was not a matter to work out in holiday atmosphere at a convention, and the proceedings at the convention do not show any material content that could support the idea that the convention setting was necessary or appropriate for action on the constitution, or contributed anything to its development. It has been noted that neither the word "convention" nor the expression "convention expense" appeared anywhere in the LM–2 reports of IPSSEU and the Locals either for the Kiamesha Lake or the Honolulu convention. No business meeting in Honolulu convened before four o'clock in the afternoon, and the longest was over before six. This was a caricature of convention, and in no real sense a business convention serving the interests of the nearly 18,000 members of the Locals.

The small group at the convention—the officers and a sprinkling of delegates elected by the membership—denies to the occasion any genuine similarity to the Meat Cutters and Butcher Workmen's convention at Bal Harbour, Florida, in August 1972,

the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators 1974 convention in Los Angeles, California, the Brotherhood of Electrical Workers convention in Kansas City, Missouri in September 1974, the International Chemical Workers Union convention in Las Vegas in September 1974 or the Retail Clerks convention in Honolulu in July 1972. The conventions in each of those cases were evidently very large conventions. The Electrical Workers, for example, assumed an attendance of approximately 3,000 delegates and a convention cost approximating $2,000,000. It appears that 1,000 delegates attended the convention of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators. No doubt these international conventions were conventions of Internationals with very much larger memberships than IPSSEU, and the ratio of attendance to total membership may not have been any higher than in the case of IPSSEU. But the examples given are useful at most to show the extent of custom rather than its rightness. Such expense account extravagances, whether at the cost of stockholders or union memberships, are not justified by their prevalence and at best earn an uneasy tolerance.

In reaching a conclusion about IPSSEU's Honolulu convention, it is the needlessness of the convention that is the most significant factor, linked with the other factors mentioned, and including as well the failure in any way to indicate the amount of the convention expense and that it was convention expense in filing the reports on the forms LM–2. . . .

So far then as concerns the Honolulu convention of 1970, the Government has shown by a preponderance of the evidence that the expenditures in which the defendants directly or indirectly participated were made in violation of 29 U.S.C. § 501(c). As such it constituted a single "racketeering activity" within the meaning of 18 U.S.C. 1961(1)(c).

■ Defendants have strenuously argued that the expenditures were authorized . . . . The argument for authorization of the expenditures—so far as they could be authorized—is better made out for the Miami convention than for the Honolulu convention, but the essential difficulty with the argument for authorization is that formal resolutions cannot authorize the expenditure of the funds of labor organizations where the expenditures are not for union benefit but are for the personal benefit of the recipients. That was the case for the Honolulu convention. . . .

Since only one instance of racketeering activity has been found it is not necessary to consider the question whether or not there was a pattern of such activity, except for the circumstances that in this non-jury trial in which the defendants did not testify, the Court of Appeals on review may consider that the undisputed evidence authorizes a different finding from that made with respect to the Miami convention.

■ The Government presented no evidence to show that the activities integral to IPSSEU's and the Locals' essential functions in representing their members in collective bargaining negotiations, organizing non-union shops, and in the other essential union activities were irregularly conducted or were in any sense comprised in whole or in part of acts which could have come within the definition of racketeering activity in Section 1961(1). If the words of Section 1962(c) have their ordinary meaning, no evidence is here found which could in any specific sense seem to show that the defendants had conducted or participated in conducting the affairs of the Union "through a pattern of racketeering activities." The particular kind of racketeering activity here challenged would have seemed to be proper Union expenditures if they could be thought integral to the conduct of the Unions' affairs. It is to the extent that they are private advantages and not sufficiently connected with the conduct of the affairs of the Unions that they become questionable under Section 501(c).

Certainly in an inclusive sense the holding of conventions is an affair of the unions, and it is not suggested that in this

case the formal action taken at the two conventions is not fully effective to elect officers and to amend the constitution. Hence, if the simple occurrence of two acts that represented racketeering activities and the fact that those acts were professedly related to the affairs of the enterprise in question were enough to make out a case under 1964 based on Section 1962(c), no more would be necessary than what the Government sought to prove in the present case. But it does not appear that, indispensable as the quinquennial election of officers and the occasional amendment of the constitution of a labor organization may be, the acts of embezzlements here charged (affecting the travel and entertainment of the delegates at the convention) had significant relation to the conduct of the union enterprises. Moreover, conducting conventions is at best a very small and infrequent part of the conduct of union affairs. The kind of embezzlements here charged, if shown and if prosecuted successfully under 18 U.S.C. § 664 or 29 U.S.C. § 501(c), may well involve disqualification to hold union office for as long as five years under the provisions of 29 U.S.C. § 504. *Cf. Lippi v. Thomas,* N.D.Pa.1969, 298 F.Supp. 242, 248.

Some light might be thrown on what is meant by conducting the affairs of an enterprise through a pattern of racketeering activity by reference to Section 1964(a) which empowers Courts in cases of a proved violation of Section 1962 to impose reasonable restrictions on the activities of any person, including but not limited to prohibiting the person from engaging in the same type of endeavor as the enterprise is engaged in, or "ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons." The available remedies suggest that the statute is concerned with that which characterizes the conduct of the enterprise in question in its essential functions rather than irregularities committed in the course of the otherwise lawful conduct of an enterprise. There is no question that Congress intended to provide a remedy adequate to the evil visualized and in that sense to enact broadly and inclusively. *United States v. Cap-*

*petto,* 7th Cir. 1974, 502 F.2d 1351, 1358. *United States v. Parness,* 2d Cir. 1974, 503 F.2d 430, 441, dealing with a criminal charge under Section 1962(b), treated the requirement of showing a pattern of racketeering activity as satisfied by three interstate transportations of stolen property resorted to in connection with the acquisition of the stock of a gambling casino. But in that case the three offenses under § 2314 of Title 18 were the gist and engine of the acquisition prohibited by Section 1962(b).

A difficulty is that Section 1961(5) does not define "pattern of racketeering activity". Rather, it simply states that there can be no proof of a pattern of racketeering activity that does not include at least two acts of racketeering activity separated by not more than ten years and with one occurring after the date of the enactment of the title.

Typical of what the Congress certainly contemplated in defining racketeering activity as it did and in setting out minimum requirements for pattern of racketeering activity is *United States v. Stofsky,* S.D.N. Y.1973, 409 F.Supp. 609. There officials and employees of a labor organization were charged with having accepted payments from certain union-shop manufacturers in return for permitting the unionized manufacturers to sub-contract certain fur manufacturing work to non-union shops in contravention of the collective bargaining agreement between the union shops and the union. The indictment charged that it had been done on twenty-one different occasions between January 1967 and September 1971. The racketeering activities were the receiving of bribes to influence the actions of an officer or employee of a labor organization (29 U.S.C. § 186(a), (b)). There the racketeering activities were perversions of the union function, they undermined the unionization effort. Yet Judge Pierce, noting the severity of the penalty for the offense of Section 1962, emphasized that the pattern to be proved was not satisfied by showing two racketeering acts. He said:

"The racketeering count in this indictment is premised on a series of misde-

meanors, violations of the Taft-Hartley Law, 29 U.S.C. § 186(d). The time span between acts could be about a year and a half. Without a limiting construction, conviction on any two of the misdemeanors, plus proof of employment and that the acts were committed in the course of employment could lead to conviction on the racketeering offense. Yet, the entire statutory scheme indicates that if these acts were isolated and unrelated they do not add up to the kind of activity Congress meant to describe when it used the word 'pattern.' This Court therefore construes the word 'pattern' as including a requirement that the racketeering acts must have been connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts." 409 F.Supp. at 614.

It is concluded, then, that even if both the Miami and the Honolulu conventions were considered to have involved expenditures in violation of Section 501(c), the totality of the evidence would not show a pattern of racketeering activity in the conduct of the affairs of IPSSEU and the Locals because the two acts did not relate to the essential functions that the union served in the regular conduct of union affairs. . . .

It is concluded, therefore, that the Government has failed to make out its case by a preponderance of the evidence.

IT IS

ORDERED that the Clerk enter judgment that the plaintiff take nothing and that the action is dismissed on the merits.