**Michael S. ENGL and Franz Hummert and Paul Walstad, individually, and on behalf of Plymouth Plaza Associates**

**v.**

**John G. BERG and Fidelity America Mortgage Company and Plymouth Plaza Office Building Associates and Montgomery County Industrial Development Authority and Plymouth Plaza Associates.**

Civ. A. No. 80–4065.

United States District Court,
E. D. Pennsylvania.

March 24, 1981.

13. For reasons not discussed in this opinion, Counts 44 through 57 are dismissed as to defendant Derrick with prejudice.

Arthur R. Littleton, Philadelphia, Pa., for plaintiffs.

William T. Hangley, Philadelphia, Pa., for PPOBA.

Michael L. Temin, Philadelphia, Pa., for Berg, Fid. Am. & PPA.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This action arises out of two separate transactions incident to the financing, syndication and resyndication of the Plymouth Plaza Project, a commercial office building constructed on previously unimproved property near the Plymouth Meeting Mall in Plymouth Meeting, PA (the property). Plaintiffs are the sole limited partners of defendant Plymouth Plaza Associates (PPA), a limited partnership organized under the laws of Pennsylvania. Defendants have filed motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6), advancing various arguments addressed to different counts of the complaint.

In 1973 defendant John Berg (Berg) entered into an agreement with the Plymouth Meeting Mortgage Corporation (PMMC) whereby he acquired a thirty year lease on the property with an option to purchase at the end of the lease period, 2003. On March 28, 1974, Berg assigned his rights under the lease agreement to defendant Montgomery County Industrial Development Authority (MCIDA), who then mortgaged the assigned interest to First Federal Savings and Loan Association of Philadelphia (First Federal) as security for a loan given by First Federal to finance the construction of the Plymouth Plaza Project. Simultaneously, MCIDA and Berg entered into an installment sales agreement (the ISA), pursuant to which Berg acquired the First Federal loan proceeds to construct the building and agreed to pay all amounts due and owing by MCIDA under the mortgage, including the obligation of continuing rental payments on the leased property. The ISA also provided that MCIDA's interest in the leasehold would terminate upon Berg's satisfaction of the First Federal mortgage obligations and MCIDA would convey to Berg its interests in the office building and any other improvements on the property.

In September, 1974, Berg organized PPA, establishing himself as general partner. On September 30, 1975, after the office building was constructed, Berg assigned to PPA his rights under the ISA. According to the complaint, plaintiffs purchased all of the limited partnership interests in PPA in December, 1975, based upon information received from Berg and a "project synopsis" which Berg distributed, for a total of $125,000 contribution to capital and $225,000 in promissory notes made out to Berg personally (the 1975 transaction). Plaintiffs allege that, in connection with that transaction, Berg made false and misleading representations to them as to the nature of the interests in the property which he had assigned to PPA.

At an unspecified time after the 1975 transaction defendant Fidelity America Mortgage Company (FAMCO), of which Berg is president, purported to succeed Berg as general partner of PPA. On December 1, 1979, Berg and FAMCO organized a new limited partnership, defendant Plymouth Plaza Office Building Associates (PPOBA), with FAMCO as general partner and twenty-six individuals as limited partners. Berg and FAMCO, acting as general partner for PPA, then conveyed PPA's interests in the ISA and the leasehold to PPOBA. In return, PPOBA granted FAMCO a "purchase money wrap-around mortgage", and FAMCO assigned a "senior participating certificate" to PPA (the 1979 transaction). Plaintiffs contend that the 1979 transaction occurred without their knowledge or approval and that it amounts to a forced sale of their interests. Plaintiffs also contend that the mortgage is inadequate in that it is non-recourse, sets the interest rate below the market rate, will not begin to amortize until 1997, and will not fully amortize until 2017, fourteen years after the lease terminates. Thus plaintiffs allege that the 1979 transaction defrauded them and PPA, and that it constituted a breach of Berg's and FAMCO's fiduciary and contractual duties.

 In counts I, II, and III of the complaint, plaintiffs allege that the 1975 transaction is actionable under various provisions of the federal securities laws. Count I alleges the making of false representations in connection with plaintiffs' purchases of partnership interests in PPA, and seeks rescission pursuant to section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2). Defendants assert that Count I is time barred pursuant to section 13 of the Securities Act of 1933, 15 U.S.C. § 77m, which provides in pertinent part:

> No action shall be maintained to enforce any liability created under ... [section 12(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after discovery should have been made by the exercise of reasonable diligence .... In no event shall any action be brought to enforce a liability ... [under section 12(2)] more than three years after the sale.

Plaintiffs contend that the three year time limitation of section 13 was tolled due to fraudulent concealment by defendants, arguing that I should consider section 13's time limitation inapplicable in this instance in order to effectuate the congressional purpose manifested in section 12(2). However, the plain language of section 13 militates to the contrary. Where the statute states that an action shall "*in no event ... be brought ... more than three years after the sale,*" 15 U.S.C. § 77m (emphasis added), the Supreme Court's general statement that fraudulent concealment "is read into every federal statute of limitation", *Holmberg v. Ambrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946), cannot be considered controlling. Moreover, the overwhelming weight of authority holds that the three year limitation is absolute, equitable considerations notwithstanding. *E. g., Brown v. Producers Livestock Loan Co.,* 469 F.Supp. 27, 33 (D.Utah 1978); *Turner v. First Wisconsin Mortgage Trust,* 454 F.Supp. 899, 911 (E.D.Wis.1978); *Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. 283, 289–91 (W.D.N.Y.1977); *Payne v. Fidelity Homes of America, Inc.,* 437 F.Supp. 656, 657–58 (W.D.Ky.1977). I recognize that one court has held to the contrary. *See In re Home-Stake Production*

*Co. Securities Litigation,* 76 F.R.D. 337, 344–45 (N.D.Okla.1975). However, *Home-Stake* is the sole exception to the otherwise unbroken line of cases holding section 13's time limitation absolute, has been ignored in numerous subsequent opinions, and is factually distinguishable from the case at bar in light of the extent and duration of the concealment there involved. *See* 76 F.R.D. at 341–42. In light of section 13's unequivocal language and the plethora of decisions holding its three year time limitation absolute, I must reject plaintiffs' contention that the statute was tolled due to fraudulent concealment. Because count I makes allegations concerning events which occurred in 1975 and the complaint was not filed until 1980, count I is time barred, and I shall grant defendants' motion as to count I.

 In count II of the complaint, plaintiffs allege that Berg and FAMCO violated section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) in connection with the 1975 transaction. Count III, brought under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1980), alleges fraud with respect to both the 1975 and the 1979 transactions. Defendants contend that these allegations are time barred with respect to the 1975 transaction; citing the three year statute of limitations contained in section 504(a) of the Pennsylvania Securities Act of 1972, 70 Pa.Stat.Ann. § 1–504(a) (Purdon Supp.1980–81). Plaintiffs contend that the statute was tolled due to fraudulent concealment, to which defendants respond that fraudulent concealment was improperly alleged. While it is well settled that state law determines the limitations period for the causes of action alleged in counts II and III, the question of when that limitations period begins to run is an issue to be determined under federal law. *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir. 1977); *Moviecolor Ltd. v. Eastman Kodak Co.,* 288 F.2d 80, 83 (2d Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). *Cf. Cope v. Anderson,* 331 U.S. 461, 464, 67 S.Ct. 1340, 1341, 91 L.Ed. 1602

(1947). "Under the federal tolling doctrine, the active concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he actually knew of the fraudulent conduct of the opposing party." *Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir. 1979), *citing Atlantic City Electric Co. v. General Electric Co.,* 312 F.2d 236, 239 (2d Cir. 1972) (en banc), *cert. denied,* 373 U.S. 909, 83 S.Ct. 1298, 10 L.Ed.2d 411 (1963). Absent active concealment, the limitations period begins to run when plaintiff, through due diligence, could reasonably have discovered the fraud. *Sperry v. Barggren,* 523 F.2d 708, 711 (7th Cir. 1975). Thus the presence or absence of active concealment is an issue of fact raised by allegation of fraudulent concealment. *Id.* Assuming *arguendo* that active concealment is disproved, "[i]ssues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case." *Robertson v. Seidman & Seidman,* 609 F.2d at 591. As such the fraudulent concealment allegation raises genuine issues of material fact, rendering resolution through summary judgment inappropriate. *See id.* at 593; *Sperry v. Barggren,* 523 F.2d at 711.

 Defendants' assertion that plaintiffs' allegation of fraudulent concealment is improper due to failure to adequately set forth that allegation in the complaint must be rejected as well. Read as a whole, the complaint adequately puts defendants on notice that fraudulent concealment is alleged, as defendants' motion addressing that issue evinces.

 Alternatively, defendants argue that count II must be dismissed because there is no private right of action under section 17(a) of the Securities Act of 1933. Citing an Eighth Circuit and an Eastern District of Louisiana opinion, they contend that the modern trend supports this position. However, this court has uniformly held that a private right of action does exist under section 17(a). *E. g., Wulc v. Gulf & Western Industries, Inc.,* 400 F.Supp. 99, 103 (E.D.Pa.1975); *B & B Investment Club v.*

*Kleinert's, Inc.*, 391 F.Supp. 720, 726 (E.D. Pa.1975); *Crowell v. Pittsburgh & Lake Erie R.R. Co.*, 373 F.Supp. 1303, 1311 (E.D. Pa.1974); *Dorfman v. First Boston Corp.*, 336 F.Supp. 1089 (E.D.Pa.1972). Moreover, other courts have adopted this view. *See In re Gap Stores Securities Litigation*, 457 F.Supp. 1135, 1142 (N.D.Calif.1978) and cases cited therein. I decline to adopt defendants' position in light of the above-cited precedent.

■■■ Defendants also make an alternative argument concerning the portion of count III attacking the 1979 transaction. Because only a purchaser or seller of a security may bring an action under section 10(b) or rule 10b-5, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), they argue that plaintiffs do not have standing to sue because they were neither purchasers nor sellers in the 1979 transaction. Plaintiffs claim that they have standing under the "forced seller" doctrine. Initially, it is clear that *Blue Chip* did not refute the "forced seller" doctrine. *Alley v. Miramon*, 614 F.2d 1372, 1385–87 (5th Cir. 1980). To determine the applicability of the "forced seller" doctrine, a court must "[f]ocus on the economic reality of the transaction" and make an "economic determination as to whether in reality the transaction constitutes a '. . . transformation of a securityholder's investment from an interest in a going enterprise into a right solely to receive payment in exchange for such interest.'" *McCloskey v. McCloskey*, 450 F.Supp. 991, 995 (E.D.Pa.1978), quoting *Murphey v. Hillwood Villa Assoc.*, 411 F.Supp. 287, 292 (S.D.N.Y.1976); *Valente v. Pepsico, Inc.*, 454 F.Supp. 1228, 1237 n.10 (D.Del.1978). Because this issue comes before me on defendants' motion to dismiss, I must accept as true all well pleaded allegations of the complaint, and decide all inferences pertinent to material facts which flow from those allegations in favor of plaintiffs. *Adickes v. Kress & Co.*, 398 U.S.

144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Viewed in this light, plaintiffs' allegations picture the 1979 transaction as one in which plaintiffs' interests in PPA were transformed from interests in a going partnership with valuable, tangible assets to interests in a shell with only highly speculative and unsecured property rights, and, as a practical matter, merely illusory rights to receive mortgage proceeds in the future. Thus the 1979 transaction must be viewed at this point as creating a "forced sale" of plaintiffs' interests in PPA, pursuant to which plaintiffs have standing to attack that transaction in count III of the complaint.

■■■ In count XII of the complaint, plaintiffs sue derivatively on behalf of PPA for violations of sections 10(b) and 20 of the Securities Exchange Act of 1934 in connection with the 1979 transaction. Other derivative claims under Pennsylvania law are set forth in counts XIII through XVI of the complaint. Defendants seek dismissal of these counts on the ground that plaintiffs may not sue derivatively on behalf of the partnership. They argue, in essence, that Pennsylvania law contains an implied prohibition against such suits because the Uniform Limited Partnership Act (ULPA) has been adopted in Pennsylvania, and because the ULPA has been interpreted in other states to prohibit derivative suits by limited partners. I note initially that the cases upon which defendants rely are at best ambiguous on the issue of the propriety of derivative suits by limited partners, as the conflicting construction urged by plaintiffs and defendants reveal. Further, Pennsylvania law does not clearly prohibit such suits. Section 545 of the Pennsylvania Uniform Limited Partnership Act, 59 Pa.Cons. Stat.Ann. § 545 (Purdon Supp.1980–81),[1] can be interpreted either way. Indeed, other courts which have addressed this issue concluded that the framers of the ULPA

---

**1.** Section 545 provides:

A contributor, unless he is a general partner, is not a proper party to proceedings by or against a partnership, except where the ob-

ject is to enforce a limited partner's right against or liability to the partnership.

59 Pa.Cons.Stat.Ann. § 545 (Purdon Supp. 1980–81).

did not focus on the problem of derivative claims in promulgating the above-cited provision, but rather intended the statute merely to prevent limited partners from interfering with the right of general partners to conduct the business of the partnership. *See Klebanow v. New York Produce Exchange*, 344 F.2d 294, 298–99 (2d Cir. 1965) (Friendly, J.) and cases cited therein. It has also been held that "the object of the derivative action is, in essence, to enforce the limited partners' rights against the Partnership, albeit by an action against the general partner, to protect their interest in the Partnership . . . . This interpretation is consistent with the purpose of the [ULPA], which is to insulate the limited partners from third parties dealing with the partnership. *Smith v. Bader*, 458 F.Supp. 1184, 1186–87 (S.D.N.Y.1978). In addition, it is established that the question of "standing in a Rule 23.1 case to assert a derivative claim based on federal law is a federal question . . ." *In re Pittsburgh & L.E.R. Co. Securities and Antitrust Litigation*, 543 F.2d 1058, 1067 (3d Cir. 1976). Unfortunately the federal rule is unclear as well. Nevertheless, guidance can be found in Judge Friendly's opinion in *Klebanow*, in which he found limited partner standing because of the confluence of the above-noted factors (standing is a federal question, law of the forum is unclear and evinces no clear policy against such standing) and by analogy to the law of trusts, which permits a *cestui que trust* to sue to enforce a claim of the trust when the trustee has wrongfully refused to do so. 344 F.2d at 296–99. Defendants argue that *Klebanow* is inapposite because it is based on New York law which is contrary to Pennsylvania law. However, I do not view New York law as do defendants, and note further that the Third Circuit has cited *Klebanow* as the leading case on this issue. *McClune v. Shamah*, 593 F.2d 482, 487 (3d Cir. 1979). The equities of the situation also militate in

favor of permitting a derivative suit, because "preclud[ing] the derivative claims would effectively bar the Partnership, and possibly the limited partners, from obtaining judicial relief as a result of the general partner's alleged self-dealing, conversion of assets and opportunities and breach of fiduciary duty." *Smith v. Bader*, 458 F.Supp. at 1168. Finally, I note that, where state law is unclear, "federal judges are entitled to resolve the doubt in a way that permits the assertion of a federal claim." *Klebanow v. New York Produce Exchange*, 344 F.2d at 299. For all of these reasons I decline to dismiss counts XI through XVI for lack of standing.

 PPOBA argues alternatively that the derivative claims must be dismissed because the 1979 transaction did not involve the purchase or sale of a security. Plaintiffs argue that the "senior participating certificate" involved therein is a security. In considering PPOBA's contention I am guided by the Supreme Court's admonition that federal securities laws are remedial in nature, and must be construed broadly. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). I must consider the economic realities of the transaction rather than the name assigned the documents involved, *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), bearing in mind that "the federal courts ought to interpret the 1934 Act with a presumption of coverage of any transaction which Congress did not expressly exclude." *Weaver v. Marine Bank*, 637 F.2d 157 at 165 (3d Cir. 1980). In determining what constitutes a security, "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *S.E.C. v. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 852, 95 S.Ct. at 2060.[2]

---

**2.** In light of the Third Circuit's recent decision in *Weaver v. Marine Bank*, 637 F.2d 157 (3d Cir. 1980), in which it specifically approved the *Howey* test, *id.*, at 162, I decline to follow the analysis utilized in *Provident National Bank v.*

*Frankford Trust Co.*, 468 F.Supp. 448 (E.D.Pa. 1978), which adopted the Ninth Circuit's "risk capital" analysis set forth in *United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1358 (9th Cir. 1977). I note also that the "risk

Applying this test in light of the above-noted policy considerations to the 1979 transaction, it is clear that the "senior participating certificate" constitutes a security. Moreover, "*every* Court to consider the status of loan participations ... has agreed that a loan participation was, or could be, a 'security.'" *Commercial Discount Corp. v. Lincoln First Commercial Corp.*, 445 F.Supp. 1263, 1267 (S.D.N.Y.1978) (emphasis in original). In addition, the *Weaver* court's conclusion that a certificate of deposit constitutes a security, *Weaver v. Marine Bank*, 637 F.2d 157 at 163–164, compels the conclusion that the "senior participating certificate" constitutes a security as well, because both are long-term debt obligations providing for the repayment of a sum certain at a fixed interest rate. *See id.*, at 161. It is clear that under the facts alleged, a finder of fact could conclude that the 1979 transaction involved a purchase and sale of the "senior participating certificate." Thus I reject PPOBA's argument that the 1979 transaction did not involve a purchase or sale of a security as a matter of law.

 PPOBA also argues that all of plaintiffs' securities law claims must be dismissed as to it due to plaintiffs' failure to plead scienter on the part of PPOBA. However, section 324 of the Pennsylvania Uniform Partnership Act states:

Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

59 Pa.Cons.Stat.Ann. § 324 (Purdon Supp. 1980–81). This section is made applicable to limited partnerships by section 311(b). 59 Pa.Cons.Stat.Ann. § 311(b) (Purdon Supp.1980–81). Further, it is well established that under the law of partnerships, knowledge and actions of one partner are imputed to all others. *Friend v. H. A. Friend and Co.*, 416 F.2d 526, 533 (9th Cir. 1969); *Posttape Associates v. Eastman Kodak Co.*, 537 F.2d 751, 757 (3d Cir. 1976). This rule has been applied to both general and limited partners. *See, e. g., Higgins v. Shenango Pottery Co.*, 279 F.2d 46, 52–53 (3d Cir. 1960). For these reasons and because plaintiffs allege fraudulent intent on the part of FAMCO, the general partner for PPOBA, their complaint adequately alleges scienter on the part of PPOBA.

 In count V of the complaint, plaintiffs allege that defendants violated title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968 (RICO), by engaging in the 1975 and 1979 transactions. Defendants contend that this allegation relies on an overly broad interpretation of RICO, and that the 1975 and 1979 transactions could not possibly be viewed as activity proscribed thereby. Plaintiffs' claim is brought under 18 U.S.C. § 1964(c), which authorizes a private action for treble damages by "[a]ny person injured in his business or property by reason of a violation of section 1962." Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "Racketeering activity" includes, *inter alia*, acts of fraud in the sale of securities. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" must include at least two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). Thus, viewing the allegations of the complaint in the light most favorable to plaintiffs, as I must in ruling on defendants' motions, FAMCO, PPOBA, and PPA are enterprises engaged in, or the

---

capital" analysis is more stringent than the *Howey* test, thus running afoul of the *Weaver* court's call for a presumption of coverage. *See Weaver v. Marine Bank*, 637 F.2d 157 at 164.

activities of which affect, interstate commerce, and the 1975 and 1979 transactions constitute racketeering activity engaged in by Berg and FAMCO which occurred within ten years of each other. Thus I must determine whether the 1975 and 1979 transactions could be viewed as conduct by Berg and FAMCO of the affairs of PPA and PPOBA through a pattern of racketeering activity, when those transactions are viewed in the light most favorable to plaintiffs. In making this determination, I note initially that RICO requires neither pleading nor proof of a nexus with organized crime. *United States v. Aleman*, 609 F.2d 298, 304 (7th Cir. 1979); *United States v. Vignola*, 464 F.Supp. 1091, 1096 (E.D.Pa.), *aff'd*, 605 F.2d 1199 (3d Cir. 1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980). I note also that Congress specifically directed that RICO be "liberally construed to effectuate its remedial purposes . . ." 84 Stat. 947. Turning to the precise question before me, I note that defendants make much of the decisions which hold that defrauding an enterprise through misuse and misapplication of its assets does not constitute participation "in the conduct of such enterprise's affairs" within the meaning of section 1962(c). *See United States v. Ladmer*, 429 F.Supp. 1231 (E.D.N.Y.1977); *United States v. Gibson*, 486 F.Supp. 1230 (S.D.Ohio 1980). Defendants contend that RICO is inapposite here because PPA and PPOBA's affairs were construction and maintenance of the Plymouth Plaza Project, and that *Ladmer* and *Gibson* stand for the proposition that defrauding investors cannot be viewed as conducting those affairs. However, such a narrow view of what constitutes the affairs of PPA and PPOBA does not give plaintiffs the benefit of all reasonable inferences to which they are entitled in the instant procedural posture. Viewed in that light, the affairs of PPA and PPOBA include the collection and investment of capital through the syndication and resyndication of the Plymouth Plaza Project as well as the construction and maintenance of the office building. Indeed, defendants so characterize PPA's affairs in their argument against plaintiffs' "forced sale" analysis. By stating that PPA remains a "going concern" which merely exchanged one set of assets for another, Memorandum of Law in Support of Motion of Defendants [Berg, FAMCO, and PPA] to Dismiss the Complaint at 15–16, defendants clearly assert that PPA's affairs and purposes include investment through syndication and resyndication. Thus the *Ladmer* and *Gibson* line of cases is clearly inapposite. Those cases merely stand for the proposition that RICO does not apply where the charged enterprise provides only a setting for racketeering activities wholly unrelated to its own purposes and affairs.[3] *United States v. Mandel*, 591 F.2d 1347 (4th Cir.), *reh. en banc*, 602 F.2d 653 (4th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), upon which defendants also rely, can be distinguished on the same basis. The charge in *Mandel* was that defendants had transferred an interest in an investment company to the Governor of Maryland in return for legislative favors wholly unrelated to the business of that company. The Fourth Circuit held that there was no nexus between the defendants' racketeering activities, bribery, and the investment company's operations and affairs. 591 F.2d at 1376. In the case at bar, however, there is clearly a nexus between the alleged racketeering activities of defendants, the 1975 and 1979 transactions, and the conduct and affairs of PPA and PPOBA, syndication and resyndication of the Plymouth Plaza Project. In

---

**3.** *See United States v. Nerone*, 563 F.2d 836 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978) (insufficient nexus between gambling operation on property of and conducted by principals of mobile home park and affairs of that enterprise, rental of mobile home space and hook ups); *United States v. Ladmer*, 429 F.Supp. 1231 (E.D.N.Y. 1977) (conversion of union funds for personal use does not constitute conduct of union affairs through racketeering activity); *United States v. Dennis*, 458 F.Supp. 197 (E.D.Mo.1978) (collection of unlawful debts on property of General Motors Corp. does not constitute conduct of affairs of General Motors through racketeering activity); *United States v. Gibson*, 486 F.Supp. 1230 (S.D.Ohio 1980) (same as *Ladmer*).

*United States v. Stofsky,* 527 F.2d 237 (2d Cir. 1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976), the court held a RICO charge appropriate in a situation analogous to the one involved in this action. In *Stofsky,* union officials were found liable, *inter alia* under RICO, for accepting bribes in return for permitting violations of provisions of a collective bargaining agreement which they were supposed to enforce. 527 F.2d at 240. Just as the racketeering activities in *Stofsky,* bribery, implicated the conduct and affairs of the union, enforcement of the collective bargaining agreement, so the 1975 and 1979 transactions implicate the affairs of PPA and PPOBA, syndication and resyndication of the Plymouth Plaza Project. In addition, *United States v. DePalma,* 461 F.Supp. 778 (S.D.N.Y.1978), is directly on point. In *DePalma,* defendants were charged under RICO with conducting the affairs of a theatre through a pattern of racketeering activity by engaging in securities fraud during the initial sale of share interests in the theatre and in bankruptcy fraud when the theatre was brought into Chapter XI. Rejecting a defendant's argument that engaging in those activities did not constitute conducting the theatre's affairs, the court stated that "[t]here is nothing in [RICO] requiring that the racketeering activity be part of the day to day business operations of an enterprise." 461 F.Supp. at 786. The court noted that the sale of securities was necessary to create the theatre as a going concern,[4] that conducting bankruptcy proceedings was integral to the theatre's affairs while in Chapter XI, and that "[t]he Indictment relates to the corporate entity, and not merely to the building which housed the theatre." *Id.* at 785–86. Thus, *DePalma* considered defendant's argument that the affairs of the theatre consisted only of showing films and selling tickets "unrealistically technical," *id.* at 786, and denied defendant's motion to dismiss based on alleged insufficiency of predicate offenses. *Id.* at 785–86. The 1975 and 1979 transac-

tions were as much a part of the affairs of PPA and PPOBA as the securities and bankruptcy frauds were a part of the affairs of the theatre. "An assertion that these [transactions] are not in the conduct of the affairs of the enterprise[s] is frivolous." *Id.* at 786. For all of these reasons, I decline to dismiss count V for the reasons advanced by defendants.

Defendants' final contention is that counts IV, VI through XI, and XIII through XVI, which assert pendent claims under state law, should be dismissed for lack of an independent basis of federal jurisdiction. In light of the above discussion, this argument must fail.

For all of these reasons, defendants' motions shall be granted as to count I and denied as to all other counts. An appropriate order follows.

---

4. However, the court noted that this sale was not necessary to create the enterprise, as the enterprise's prior existence is a necessary pre-

requisite to sale of securities to the public under the securities laws. *United States v. DePalma,* 461 F.Supp. 778, 785 (S.D.N.Y.1978).