**Harvey N. MIGHELL, Appellant,**

v.

**UNITED STATES of America,** **Appellee.**

**No. 5185.**

United States Court of Appeals Tenth Circuit.

May 17, 1956.

Carl V. Rice, Kansas City, Kan. (Ernest J. Rice, Topeka, Kan., and Claude L.

Rice, Kansas City, Kan., were with him on the brief), for appellant.

Royce D. Sickler, Asst. U. S. Atty., Wichita, Kan. (William C. Farmer, U. S. Atty., Topeka, Kan., was with him on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This is an appeal from a conviction in the United States District Court of Kansas for criminal evasion of federal income taxes. Defendant, Harvey N. Mighell, was found guilty under 26 U.S.C.A. § 145(b) on four counts for wilful failure to report substantial amounts of his income in 1947, 1948, 1949 and 1950. He was fined $3,000 and sentenced to imprisonment for a period of two years on count one, and to imprisonment for two years on each of the other three counts, such sentences to run concurrently with each other and with the sentence imposed on count one.

The proof for the prosecution was based upon the net worth method, sanctioned with limitations by the Supreme Court in Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, and three companion cases.[1] It is admitted that defendant was actively engaged in the illegal business of buying and selling liquor in Kansas prior to the prosecution period and during 1947. There is dispute over whether such business continued in 1948 and later years. He also had income during the prosecution period from farming, oil, hotel and cafe partnerships, gambling, and some nonrecurring sources. A substantial amount of evidence was presented concerning these various dealings. The appeal raises only two principal questions: (1) Did the Government satisfy its burden of proof to establish a substantially accurate net worth statement as of the beginning of the prosecution period, January 1, 1947; and (2) did the government diligently pursue the leads which would tend to support defendant's innocence?

■■ There is dispute over the inclusion or exclusion of several items in calculating the net worth of defendant at the various crucial dates. The principal controversy, however, is over alleged cash and liquor inventory which defendant claims he had on hand at the beginning of the prosecution period. The Government, in its presentation, gave defendant credit for no liquor inventory and only $10,100 cash on hand as of December 31, 1946. Defendant claims he had approximately $115,000 in cash and liquor inventory as of that date. If defendant's contention is true the excess expenditures during the 1947 to 1950 period relied upon by the Government are very largely explained since it is agreed that at the end of 1950 defendant had only about $10,000 cash and no liquor on hand. The burden of persuasion, of course, is upon the Government, and if we find there was no evidence reasonably tending to support the jury's verdict the judgment of conviction must be reversed.

The Government's computations established the net worth as of December 31, 1946 of $123,318.01, and a net worth at the end of 1950 of $233,803.58, an increase of $110,485.57. The Government's evidence tending to support its calculations of appellant's net worth status was as follows: From 1921 to 1928 defendant was a mechanic making an average of $110 per month. Between 1929 and 1936 he farmed, was a mechanic and tinsmith and bootlegged some whiskey. From 1938 to April, 1940 he was serving a sentence in the Iowa State Penitentiary. Sometime during 1940 he was divorced from his first wife, in which proceeding there was no property settlement and no alimony award. According to his parole reports, between April, 1940 and at least May, 1941 he

1. Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202.

worked on his father's farm for $20 per month. During this time he reportedly received small amounts of money—from $2 to $10—from time to time from his mother. A 1941 investigation by the Alcohol Tax Unit of the Internal Revenue Department in Iowa found no assets of the defendant. On November 14, 1941, he placed a $414.30 chattel mortgage on a 1941 Ford automobile, which he had or purchased.

During March and April, 1942 he worked for the Cessna Aircraft Company for 60 cents an hour. During the last six months of 1942 he was serving a Missouri sentence for transportation of liquor and had no earnings. In 1944 when he purchased the home in Russell, Kansas, he mortgaged it for $5,000. It was shown that he had no substantial inheritances or gifts. His first federal income tax return was filed in 1943. From 1943 through 1946 he reported a net income of approximately $57,000.

Appellant was married to his second and present wife in December, 1942. An investigation showed that she had acquired no substantial amount by way of gifts, loans, or inheritances. Her first federal income tax return was filed in 1942 showing income of less than $2,400. She testified that at the beginning of 1943 her assets amounted to about $1,000. This in substance was the Government's evidence from which it prepared appellant's net worth statement as of December, 1946.

Appellant offered substantially the following evidence. His son and his wife testified that $50,000 cash was buried in 1943. A garage owner stated that prior to 1945 appellant had left various amounts of cash of as much as $38,000 with him from time to time for overnight safekeeping. Other persons testified that he had large sums of money on different occasions in the pre-prosecution period. Edward Flaherty, a former partner, testified that for an operation as large as that of appellant's it would take a bank roll of as much as $50,000.

There was testimony concerning nearly $35,000 of mutilated or deteriorated money turned over in 1950 to a bank in Russell, Kansas, and one in Omaha, Nebraska. Appellant's wife testified that she told an agent for the Government that she put $26,000 of such money in the First National Bank of Omaha, Nebraska. A check by a government agent with that bank showed a deposit in that amount but there was no record that it was deteriorated money.

■ The most that can be said from this evidence is that it presented a conflict for the jury's determination. No one other than appellant's wife testified that appellant had on hand $50,000 or any substantial part thereof as operating capital at the beginning of 1947. Neither was there any direct evidence that there was on hand at any time a substantial liquor inventory. We are in effect asked to presume that there must have been on hand a large inventory in order to carry on illicit liquor operations of such magnitude, but such a presumption disregards the very nature of appellant's illegal business. His business was carried on in dry territory close to the border of a state where the purchase of liquor was lawful. It is not unreasonable to presume, especially in the absence of any evidence to the contrary, that rather than subject himself to search and seizure appellant sent the trucks which he owned across the line by stealth, loaded them with liquor, and transported it to its destination, rather than keeping on hand in dry territory, where it was subject to confiscation, large quantities from which to make deliveries. In any event in the absence of any clear and convincing evidence that appellant had on hand a substantial liquor inventory, the question at best was for the jury.

Neither was the evidence conclusive that there was a buried hoard of $50,000 or, if there was, when it was buried. But even if we assume that such sum was buried prior to 1947, it still leaves unaccounted for a very substantial amount of unreported income, if the jury believed the Government's evidence, as it apparently did.

In the second assignment of error it is urged that the Government failed to follow all reasonable leads in an attempt to establish the true facts in its net worth case, as required by Holland v. United States, supra, and kindred cases. Two instances of this failure to track down leads are urged in connection with the buried money contention. When Internal Revenue investigators were questioning appellant on December 9, 1952, he mentioned the buried money and asserted that his son Roger had seen him count it during the period prior to 1947. It is urged that the Government erred in not interrogating the son. At this time appellant's son was in the army. His address was furnished and it is urged that the Government erred in not having someone near the boy's army camp interrogate him on the claim of buried money before the father had time to prepare him for the questioning. Appellant had stated to the investigator that "I don't think he will answer any questions for you." In view of that as well as the further fact that if the son had corroborated his father's statement, it would not have conclusively established the existence of such a buried hoard at that time, it is our view that failure to interrogate the son did not constitute a violation of the admonition of the Supreme Court.

With respect to the cashing of the mutilated or deteriorated money in Russell, Kansas, and Omaha, Nebraska, it is urged that the Government should have done more checking than it did. Appellant's wife told the agents that she put $26,000 of this money in the first National Bank of Omaha, Nebraska. The agent did check with the bank and the records there showed such a deposit but no record that it was deteriorated money and the agent did not investigate further than writing to the Currency Redemption Department. No hint was given by appellant's wife that the deteriorated money had first been converted to good money at the Omaha National Bank and the good bills then taken and placed in deposit in another bank. In the absence of more information than the Government had, we do not think it was required to check every bank in Omaha to see if deteriorated money had been redeemed there.

The instant net worth case involves tracing transactions over a number of years. Appellant's total net worth at the end of the prosecution period was nearly a quarter of a million dollars. Taking this into account and the further fact that books on a large part of the operation were nonexistent, it seems inconceivable that all ends would be tied down and no remote possibilities overlooked. It is our conclusion from a careful examination of the entire record that the Government made a reasonable effort to track down all sources of possible information in establishing appellant's net worth and that there was no violation of the admonition laid down by the Supreme Court in the Holland case.

Affirmed.