UNITED STATES of America, Plaintiff,

v.

John F. GIBSON, Defendant.

No. CR–1–79–23–1.

United States District Court, S. D. Ohio, W. D.

March 14, 1980.

---

James C. Cissell, U. S. Atty., Anthony M. Nyktas, Patrick J. Hanley, Asst. U. S. Attys., Cincinnati, Ohio, for plaintiff.

F. Lee Bailey, Anthony Cardinale, James Merberg, Boston, Mass., Timothy A. Hickey, Cincinnati, Ohio, for defendant.

## OPINION

DAVID S. PORTER, Senior District Judge:

This matter is before the Court on defendant John F. Gibson's motion for judgment of acquittal on two counts of the instant indictment. Fed.R.Crim.Pro. 29(c). We are presented with two issues: first, whether the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., encompasses the violations of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 401 et seq., charged in this case, and second, whether evidence of financial transactions during a single year is sufficient to support a conviction for false statement on an income tax return.

Defendant John F. Gibson, who is General Secretary Treasurer of the Hotel and Restaurant Employees' and Bartenders' International Union ("the Union"), was the subject of an eighteen count indictment filed in March, 1979. Count I charges violation of RICO, asserting that Gibson embezzled Union funds on several occasions. Counts II, III, and V through XVI charge criminal violations of the LMRDA by embezzlement of Union funds and making false entries on Union records. Count IV charges a conspiracy to embezzle Union funds, and Counts XVII and XVIII charge that Gibson filed false individual income tax returns for the years 1974 and 1975.

Counts III and VII and part of Count I were dismissed prior to trial on the government's motion. The remaining charges were tried before a jury. At the conclusion of the government's case defense counsel moved for a judgment of acquittal on all the charges tried. Fed.R.Crim.P. 29(a). The Court took the motion under advisement and the defendant's case was presented. At the conclusion of all the evidence the Court denied the motion for judgment of acquittal as to Counts II through XVI but kept the motion under advisement as to Counts I, XVII, and XVIII. Fed.R.Crim.P. 29(b).

The jury returned verdicts of guilty on Count XVII and not guilty on Counts IV, X through XVI, and XVIII. No verdict was returned on Counts I, II, III, V, VI, VIII, and IX, and the Court declared a mistrial as to these counts.

After the jury was discharged the Court ordered submission of memoranda of points and authorities to aid its determination of the motion for judgment of acquittal on

Counts I and XVII.[1] Oral argument also was allowed.

While our discussion of these two counts is separated below, the same standard of review applies in determining the motion as to each of them. We must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941), and determine whether there is sufficient evidence from which a jury can find guilt beyond a reasonable doubt. *Fed. R.Crim.P.* 29(a); *United States v. Grimes*, 332 F.2d 1014, 1016 (6th Cir. 1964); *Wright, Federal Practice and Procedure: Criminal* § 467 at 254–257 (1969). This standard is not altered when, as in the case of the tax count, only circumstantial evidence is offered by the government. *United States v. Scott*, 578 F.2d 1186, 1191–92 (6th Cir. 1978), cert. denied, 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978); *United States v. Bradley*, 421 F.2d 924, 926 (6th Cir. 1970); *United States v. Conti*, 339 F.2d 10, 12–13 (6th Cir. 1964); *Wright, supra*, at 257–259.

After thorough consideration, the Court concludes that judgment of acquittal must be entered both on Count XVII and on Count I. As to Count XVII, we find that the prosecution's method of proof was wholly inadequate to prove false statement beyond a reasonable doubt. As to Count I, we conclude that the prosecution has incorrectly analyzed the statute (RICO), and that the acts alleged and proven do not amount to a RICO violation. More particularly, the record is devoid of evidence that Gibson conducted the Union's affairs through a pattern of racketeering activity. In this connection we feel compelled to note that our conclusion suggests nothing as to whether Gibson is guilty of acts of embezzlement from the Union. He may be reprosecuted on those embezzlement counts on which the jury did not reach a verdict.

## COUNT XVII

Count XVII charges Gibson with making a false statement on his 1974 individual federal tax return in violation of 26 U.S.C. § 7206(1).[2]

The government contends that Gibson overstated by at least $5,147.66 the amount of his nonreimbursed employee business expenses on the 2106 form which was attached to his 1040 form. *See* 2 CCH Std. Fed. Tax Rpts. ¶ 1350.025 at 17,011 (1980). Such expenses are deductible from adjusted gross income and could reduce tax liability. 26 U.S.C. §§ 63, 72, 161, 162.

### A. EVIDENCE

Defendant's 1974 tax return claims nonreimbursed employee business expenses of $16,320 (GX 74–15, Form 2106). This figure is an estimate obtained by taking 272, which is the number of days defendant was out of town on Union business during 1974, times $60, which is the estimated average daily amount of out-of-pocket cash outlays for business purposes made by defendant when out of town on Union business (GX 74–14, accountant's notation).

The government presented evidence intended to show that defendant did not have enough cash on hand during 1974 to incur the claimed expenses. Internal Revenue Service agents Kurt Greber and John Byrne testified they reviewed and summarized Gibson's financial records in an effort to determine how much cash he had available to make the claimed expenses. To arrive at a cash availability figure for 1974 they first analyzed all income and other receipt items received by Gibson during 1974, and then analyzed his disbursements during that year.

Records summarized by the IRS agents showed Gibson received $119,943.40 during

---

1. Since the jury returned a verdict of not guilty on Count XVIII, a determination on Gibson's motion relating to that charge is unnecessary.

2. 26 U.S.C. § 7206(1) provides in pertinent part:
   Any person who . . . [w]illfully makes and subscribes any return, statement, or oth-

er document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony . . . .

1974 (GX 74–12). The receipt items summarized consisted of payroll, per diem and reimbursement checks from the Union, Veterans Administration checks, interest paid and principal returned on certificates of deposit and Treasury bills, interest on savings accounts, and unidentified deposits. Of the $119,943.40 received, the IRS agents testified that $113,159.88 was deposited to defendant's savings and checking accounts at a Cincinnati bank. The remaining $6,783.52 was traced to Union and Veterans Administration checks that were exchanged for cash.

The IRS agents' summary of disbursements from Gibson's bank accounts showed that he negotiated $11,015.82 in personal checks payable to "Cash" or "John F. Gibson" during 1974 (GX 74–12). The summary also shows these personal checks were cashed on a fairly regular basis, about two or three a month, and usually were in the amount of $500 (GX 74–12).

The $11,015.82 from cashed personal checks and the $6,783.52 from the other cashed checks total $17,799.34. According to the records summarized by the IRS agents, this figure was the total amount available to the defendant for cash outlays in 1974 (Byrne trans. at 19; GX 74–12).

The IRS agents next summarized records of cash expenditures by defendant in 1974 for personal items, that is, items that are not tax deductible (GX 74–11). These expenditures totaled $6,627. The agents testified that this amount should be subtracted from the $17,799.34 they had determined to be the total amount of cash available to defendant during 1974 in order to show the amount of cash he had available for deductible business expenses that year (Greber trans. at 26–28, Byrne trans. at 19–20). Subtracting $6,627 from $17,799.34 yields a difference of $11,172.34. The agents also testified that the $11,172.34 difference was a maximum available cash figure because it did not reflect undocumented cash outlays for personal items such as groceries and haircuts (Greber trans. at 28, Byrne trans. at 23).

## B. IRS AGENTS' CONCLUSIONS

Based on his analysis of the records summarized, IRS agent Byrne concluded that defendant's claim of $16,320 for nonreimbursed business expenses in 1974 is not accurate (Byrne trans. at 22). He testified that defendant had no more than $11,172.34 in cash available to make the claimed expenditures and, therefore, the $16,320 figure overstated employee business expenses by at least $5,147.66 (Byrne trans. at 21–23).

Only evidence of defendant's 1974 financial transactions was presented to support the government's contention that he did not have enough cash available during that year to make the expenditures claimed on his 1974 tax return. No documents or testimony was adduced as to defendant's financial condition prior to 1974, and no figure was proffered for defendant's cash on hand at the beginning of 1974.

The IRS agents testified that they did not assume defendant had no cash on hand at the beginning of 1974, but rather that defendant's cash on hand was static throughout 1974 (Greber trans. at 57–60, Byrne trans. at 49–51). If one assumes that Gibson's cash on hand was the same throughout the year, agent Greber testified, it is unnecessary to take into account cash on hand in determining cash availability for the claimed expenses, because cash on hand would not affect the flow of cash during the course of the year (Greber trans. at 57–58). Agent Byrne testified that his summaries of Gibson's 1974 financial dealings did not include a figure for cash on hand because he found no evidence of sources of cash other than those in the records summarized (Byrne trans. at 50).

Gibson did not provide the IRS agents with any leads to other sources of cash (Greber trans. at 43–44), nor did he offer any explanation at trial for the discrepancy between his claimed cash expenses and the available cash figure developed by the IRS agents.

## C. CONTROLLING LAW AND ITS APPLICATION

This Court's task in ruling on defendant's motion for judgment of acquittal on Count

XVII is a difficult one because of the method of circumstantial proof used to support that charge. We find ourselves in an unprecedented situation.

The leading case on use of circumstantial proof in tax fraud cases is *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In *Holland* the Supreme Court scrutinized and approved use of the "net worth" method of circumstantial proof, carefully enunciating cautions and standards that should be observed "when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." 348 U.S. at 129, 75 S.Ct. at 132. The "net worth" method compares the value of a taxpayer's assets and expenditures at the beginning and end of a tax year in order to show unreported income. 348 U.S. at 124, 75 S.Ct. at 129; *see* H. Balter, *Tax Fraud and Evasion* ¶ 13.-03[4][a][i] (1976). This differs from the method used in this case, termed by the government "a cash flow type of analysis" (doc. 50, p. 2), which focused only on cash availability. This difference does not, however, preclude adherence to the cautions and standards laid out in *Holland* because both methods attempt to show an inaccurate representation by the taxpayer to the government and both methods require opening cash on hand (*i. e.*, the amount of cash the taxpayer has at the beginning of the tax year scrutinized) be established so

that current expenditures are not erroneously attributed to prior accumulations of cash. *Id.*, ¶¶ 10.04[10][a][iv], 13.03[4][a][ii].[3]

The net worth method was found in *Holland* to be "so fraught with danger for the innocent that the courts must closely scrutinize its use." 348 U.S. at 125, 75 S.Ct. at 130. The Supreme Court cautioned:

> [t]he complexity of the problem is such that it cannot be met merely by the application of general rules [citation omitted]. Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. 348 U.S. at 129, 75 S.Ct. at 132.

The key element in a net worth case is establishing an "opening net worth," and an important factor in that calculation is the amount of cash the taxpayer has on hand at the beginning of the selected year. *See Holland v. United States*, 348 U.S. at 132–35, 75 S.Ct. at 133–35; *United States v. Balistrieri*, 403 F.2d 472, 478–80 (7th Cir. 1968); H. Balter, *supra*, ¶ 1304[4][a][ii]. It is at this point that the principles established in *Holland* come to bear on the case at bar. The "cash flow" method of circumstantial proof used by the government necessarily requires calculation of cash on hand at the beginning of 1974. Without such a

---

3. *Holland* also differs from the case at bar in that the charge in *Holland* was tax evasion, *see* 26 U.S.C. § 7201, and the charge in this case is false statement in violation of 26 U.S.C. § 7206(1). This difference does not preclude application of *Holland* principles because the methods of circumstantial proof used were aimed at corresponding elements of the two crimes. The elements of tax evasion are (1) existence of a tax deficiency, (2) willfulness and (3) an affirmative act constituting evasion or attempting evasion. *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965). The circumstantial evidence in *Holland* attempted to prove a deficiency by showing an understatement of income. The elements of false statement are (1) inaccurate entry, (2) willfulness, and (3) materiality of the entry. *United States v. Pomponio*, 429 U.S. 10, 11, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976). The circumstantial evidence in this case attempted to prove inaccurate entry by showing

that the amount claimed for employee business deductions was overstated. The tax deficiency element of an evasion charge and the inaccurate entry element of a false statement charge correspond in that both require proof of an erroneous claim on a tax return.

The principles of *Holland* have been consistently applied when circumstantial proof has been used in false statement cases. *See United States v. Slutsky*, 487 F.2d 832 (2nd Cir. 1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974); *United States v. DeLucia*, 262 F.2d 610 (7th Cir. 1959), cert. denied, 359 U.S. 1000, 79 S.Ct. 1136, 3 L.Ed.2d 1029 (1959); *United States v. Donovan*, 142 F.Supp. 703 (E.D.Va.1956).

We also note that during cross-examination IRS agent Greber explained that his analysis of Gibson's finances was "in effect comparable to what we refer to as a net worth analysis" (Greber trans. at 57).

calculation it would be impossible to show with sufficient certainty that Gibson did not have enough cash to make the claimed expenses, for he might have accumulated cash prior to 1974 and used it to meet expenses during that year.

■ *Holland* holds that opening net worth, and therefore opening cash on hand, must be established with "reasonable certainty." 348 U.S. at 132, 75 S.Ct. at 133. The meaning of this standard is pivotal to our determination because it provides the threshold the government must cross in order to obtain a jury determination. The evidence must be sufficient for the jury to find that the accuracy of the government's calculation for opening cash on hand is reasonably certain. *United States v. Carter*, 462 F.2d 1252, 1254 (6th Cir. 1972), cert. denied, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972); *United States v. David*, 168 F.Supp. 269, 273 (N.D.Ohio 1958), affirmed, 264 F.2d 248 (6th Cir. 1959), cert. denied, 359 U.S. 967, 79 S.Ct. 879, 3 L.Ed.2d 835 (1959); *see United States v. Calderon*, 348 U.S. 160, 163, 75 S.Ct. 186, 187, 99 L.Ed. 202 (1954); *Holland v. United States, supra*, 348 U.S. at 129, 75 S.Ct. at 132. The Court in *Holland* did not, unfortunately, expand on the meaning of "reasonable certainty" except to comment that "[t]he importance of accuracy in this [opening net worth] figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset." 348 U.S. at 132, 75 S.Ct. at 134.

■ Case law teaches that while the opening figure must be accurate it need not be exact. In *United States v. Calderon, supra*, which was a companion case to *Holland*, the Supreme Court found the government's figure of $500 for opening cash on hand satisfactory because it was based on an approximation by the taxpayer which was corroborated by independent evidence. 348 U.S. at 162–63, 75 S.Ct. at 187. In *United States v. Carter, supra*, the Sixth Circuit approved the government's figure of $1,000 for opening cash on hand for each of three tax years in a net worth case because

the government supplied circumstantial evidence that contradicted the taxpayer's claims of a higher figure. 462 F.2d at 1255–56. These decisions indicate that opening cash on hand figures may be deemed accurate without being precise if sufficient assurances of trustworthiness are presented. *Cf.* H. *Balter, supra*, ¶ 13.-03[4][a][ii] at 13–19 n. 62.

■ Courts reviewing challenges to opening cash on hand calculations implicitly apply a two-part analysis when evaluating their trustworthiness. First, the government's obligatory investigation of explanations furnished by the taxpayer is reviewed. Second, the evidence supporting the government's cash on hand calculation is scrutinized. *See Holland v. United States*, 348 U.S. at 135–36, 75 S.Ct. at 135; *United States v. Slutsky*, 487 F.2d 832, 842–44 (2nd Cir. 1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974); *United States v. Carter*, 462 F.2d at 1254–56.

■ In *Holland* the Supreme Court established the requirement that the government investigate explanations and leads supplied by the taxpayer which would establish his innocence. 348 U.S. 135–36, 75 S.Ct. at 135. This obligation extends, however, only to those explanations and leads which are specific and ostensibly reliable. *United States v. Carter, supra*, 462 F.2d at 1255; *Smith v. United States*, 236 F.2d 260, 267 (8th Cir. 1956), cert. denied, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118 (1956); *Mighell v. United States*, 233 F.2d 731, 734 (10th Cir. 1956), cert. denied, 352 U.S. 832, 77 S.Ct. 47, 1 L.Ed.2d 52 (1956); H. Balter, *supra*, ¶ 13.03[4][a][iv]. And no obligation accrues when the taxpayer fails to provide any information. *United States v. Goichman*, 407 F.Supp. 980, 986 (E.D.Pa.1976), affirmed 547 F.2d 778 (3d Cir. 1976); *see Holland v. United States*, 348 U.S. at 138–39, 75 S.Ct. at 136–37; *United States v. Procario*, 356 F.2d 614, 617 (2nd Cir. 1966), cert. denied, 384 U.S. 1002, 86 S.Ct. 1923, 16 L.Ed.2d 1015 (1966).

■■ Evidence supporting the cash on hand calculation is scrutinized to see if it is

sufficient to support a finding that no significant amount of cash, other than that calculated, exists. *United States v. Slutsky*, 487 F.2d at 843; *United States v. Carter*, 462 F.2d at 1256; *United States v. Balistrieri*, 403 F.2d at 479; *United States v. Goichman*, 407 F.Supp. at 986. In the context of a tax evasion charge proved by the net worth method, such support can be evidence of a likely source of unreported income, *Holland v. United States*, 348 U.S. at 137–38, 75 S.Ct. at 136, or evidence negating all possible sources of nontaxable income. *United States v. Massei*, 355 U.S. 595, 595–96, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958). Thus even without taxpayer-supplied leads the government has the burden of providing evidence sufficient to establish its opening cash on hand calculation with reasonable certainty.

Applying the first part of this analysis in the case at bar, we find that Gibson supplied no explanation or leads to the IRS agents investigating his financial dealings. Gibson himself declined to speak with the agents and offered no explanations at trial. The agents were aware that Gibson shared a safe deposit box with a friend, Diane Bick, during 1974 but their uncontradicted testimony was that they could not examine the contents of that box without Gibson's permission, and that such permission was not given (Greber trans. at 60–61, Bryne trans. at 53–55). Defense counsel asserted on cross-examination of agent Byrne that Gibson had another safe deposit box in St. Louis, Missouri (Byrne trans. at 53–55), but no documents or testimony supporting this assertion was presented (*see* testimony of Camalita Kelly). If counsel's assertion can be construed as an explanation or lead, it is hardly specific or timely enough to warrant inquiry.[4] The government fulfilled its obligation to investigate leads in this case.

Scrutiny of the evidence supporting the government's cash on hand calculation is the second part of the analysis. As noted above, the inquiry is whether the evidence is sufficient to support a finding that no significant amount of cash, other than that calculated, exists. In this case the government made no attempt to establish a specific figure of 1974 opening cash on hand. Rather the government contends that the amount of cash Gibson had on hand throughout 1974 was static and had no impact on the amount of cash available for the expenses claimed on the 2106 form. The evidence offered in support of this contention consisted, in essence, of checks Gibson exchanged for cash during 1974. The government argues that one can infer that Gibson did not have a source of cash other than these checks because they were cashed on a periodic basis in large, fairly consistent amounts. The regularity of exchanges and amounts shows, the government asserts, Gibson looked only to these checks for cash during 1974.

The contention of static cash on hand is not untenable. In *United States v. Giacalone*, 574 F.2d 328 (1978), cert. denied, 439 U.S. 834, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978), the Sixth Circuit specifically approved the use of dashes to represent cash on hand in a summary chart showing assets and liabilities during years the government contended the defendant evaded taxes. The defendant in that case was a professional gambler and the Court noted that the nature of a large-scale gambler's activities precluded exacting proof of unreported income. The Court found the dashes represented a constant bankroll of an undetermined amount and held that "[t]he recognition of a cash bankroll treated as a constant, *together* with proof which would support a finding that no significant cash hoard existed, was a sufficient accounting for cash in the opening net worth computation." 574 F.2d at 333 (emphasis added). *Accord, United States v. Carriger*, 592 F.2d 312, 314 (6th

---

4. There was ample testimony that Gibson gave large cash tips to bar and restaurant personnel. Doing so, apparently, is an assumed obligation of high-ranking officers in the Union. Defense counsel suggests that the agents' failure to interview the recipients of those tips was failure to follow a lead (see Greber trans. at 49–56). This suggestion misses the mark, for the focus of inquiry is possible *sources* of the cash Gibson claims he expended, not recipients of the cash. Information on the application of the claimed expenses is not relevant to this inquiry.

Cir. 1979). The evidence presented in *Giacalone* to prove the lack of a cash hoard was a detailed analysis of the defendant's financial transactions during a 16-year period which showed a negative cash position prior to the first indictment year. 574 F.2d at 332. The defendant's conviction was upheld.

Unlike *Giacalone*, there was no analysis of the defendant's financial transactions during preindictment years in this case. The government relies solely on analysis of transactions made during 1974. This reliance puts us in an unprecedented situation for we are aware of no tax fraud case involving cash on hand calculations where a financial history of the taxpayer was not presented.

In *Giacalone* the Court notes that "[e]vidence which carefully traces the financial history of a defendant and discloses expenditure in excess of reported resources in the period immediately preceding the indictment years is sufficient to support a finding that there was no cash hoard." 574 F.2d at 332. For this proposition the Court cited *Friedberg v. United States*, 348 U.S. 142, 144, 75 S.Ct. 138, 139, 99 L.Ed. 188 (1954). *Friedberg* was a companion case to *Holland* and upheld an evasion conviction that had been affirmed by the Sixth Circuit (207 F.2d 777 (1953)). In *Friedberg* a financial history covering 22 years prior to the indictment years was presented. Neither *Friedberg* nor *Giacalone* states that a financial history is required. These two cases do, however, effectively set a standard for the type of evidence that would support a finding that no cash hoard exists. In both cases substantial evidence tending to negate the ability of the taxpayer to accumulate a cash hoard was presented. This was also done in two other Sixth Circuit cases noted in this opinion: *United States v. Carriger*, 592 F.2d at 314 ("Starting with a financial statement which the defendant prepared in 1966 the government witnesses analyzed Carriger's income and expenditures through 1970 and concluded that he could not have accumulated large amounts of cash or other assets which were unknown to them."); and *United States v. Carter*, 462 F.2d at 1256 ("Ad-ditionally, there was strong circumstantial evidence from which the jury could properly have inferred that appellant did not have the large sum of cash in a safety deposit box in 1962 as he claimed . . ."). *See also* H. *Balter, supra*, ¶ 13.03[4][a][ii] at 13–20.

Requiring evidence tending to negative the ability of the taxpayer to accumulate a cash hoard effectively applies *Holland*'s requirement that reasonable explanations inconsistent with the taxpayer's guilt be negated. 348 U.S. at 135, 138, 75 S.Ct. at 135, 136. Because the tax fraud charged in this case was false statement on a return there is no requirement, as there would be in an evasion prosecution, that evidence of a likely source of unreported income or evidence negating all possible sources of nontaxable income be presented. The focus of inquiry here is narrower. Requiring evidence tending to negate the taxpayer's ability to accumulate a cash hoard insures that the burden of proof remains on the government. In a case such as this one, where the prosecution contends cash on hand was static, fulfilling this requirement is the only means of providing "proof which would support a finding that no significant cash hoard exist[s]." *United States v. Giacalone*, 574 F.2d at 333. If this requirement is fulfilled then there is a basis for finding that no significant amount of cash, other than that calculated, exists, and a jury can determine whether opening cash on hand was established with "reasonable certainty."

In the final analysis, our inquiry in this case becomes whether the evidence presented satisfies this requirement. The question which confronts us is, stated narrowly: "Does evidence of Gibson's 1974 financial transactions alone tend to negate his ability to accumulate a cash hoard which could have been used for the expenditures claimed on the 2106 form?" Our answer is that as a matter of law it does not. While this evidence tends to negate Gibson's ability to accumulate cash during 1974, it shows nothing about his ability to accumulate cash prior to 1974. Without an accurate cash on

hand figure or proof of inability to accumulate cash prior to 1974, the jury has no basis for a finding that no significant amount of cash, other than that calculated, existed. Sufficient assurances of the trustworthiness of the static cash on hand contention are not present, and there is no support for a finding that Gibson's cash on hand was established with reasonable certainty. Evidence from which a jury can find guilt beyond a reasonable doubt thus does not appear in this record.

The lack of evidence going to Gibson's ability to accumulate cash prior to the indictment year is particularly significant in this case because the only point of contention was cash available during 1974. By limiting the scope of inquiry to a single item, the government sharpens the need for accuracy. Against this background it is clear that the approach used by the prosecution does not provide sufficient assurances of trustworthiness.

In reaching our conclusion on Count XVII we have scrupulously viewed the evidence in the light most favorable to the government. To put our decision in perspective, however, we think it appropriate to comment briefly on some of the evidence presented. First, we note that Gibson's 1974 tax return, which was prepared by a certified public accountant, reveals he had taxable income of $58,499 and paid $21,335 in taxes. If Gibson was intent on wilfully defrauding the government it seems logical that he would have made a more substantial effort. Second, considering together all of the summary exhibits of checks cashed (GX 74–1, –2, –4, –12) we were extremely indulgent toward the government in characterizing, as we did above, the exchanges for cash as "periodic" and for "fairly consistent amounts." The summaries show periods between exchanges ranging from three to thirty days and check amounts ranging from $28 to $2,000. Finally, the evidence shows Gibson transferred $23,-368.76 from his savings account in St. Louis to his savings account in Cincinnati on January 22, 1974 (GX 74–6). The amount and date of the transfer raises, at a minimum, an inference that Gibson had the ability to accumulate a cash hoard prior to 1974.

In sum, we find the government's "cash flow analysis" method of circumstantial proof wholly inadequate in this case. It does not provide a basis for determining cash on hand with reasonable certainty, and it is fraught with the same dangers the *Holland* Court found in the net worth method. 348 U.S. at 127–29, 75 S.Ct. at 131–32. Among other problems, a taxpayer would encounter obstacles in convincing the jury of the existence of hidden savings, and the government's charts summarizing financial transactions tend to acquire an existence of their own. We are obligated to minimize these dangers by closely scrutinizing the use of this method. In doing so here we conclude it provides no support for a finding that Gibson's cash on hand was static during 1974.

## COUNT I

We turn to consideration of Gibson's arguments pertaining to Count I, the RICO charge.

18 U.S.C. § 1962(c) provides that,

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

A "pattern of racketeering activity" is defined by the statute as,

at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity . . . ."

18 U.S.C. § 1961(5). "Racketeering activity," in turn is defined to include "any act which is indictable under title 29, United States Code, . . . Section 501(c) (relating to embezzlement from union funds) . . . ." 18 U.S.C. § 1961(1)(C).

In challenging the prosecution's proof on Count I, Gibson's written memorandum makes two basic points. Assuming *arguendo* that the prosecution has proven all of the acts alleged in Counts II, V, VIII and IX,[5] Gibson argues, the prosecution still has failed to prove either:

(1) a "pattern" of racketeering activity sufficient to support a conviction under § 1962(c), or

(2) that Mr. Gibson conducted or participated in the Union's affairs by means of or through such racketeering activity.

In addition, at oral argument defense counsel made a generalized protest that Gibson is being singled out and charged with racketeering for doing what at most may be characterized as minor misconduct. Defense counsel vehemently argued that, under any common sense interpretation of the statute, "three joyrides in the union plane and a girlfriend on the union payroll who perhaps didn't give full time to the union" cannot be characterized as racketeering activity. The statute, argues the defense, requires something more "complex and significant" than these "minor matters."

Thus, before proceeding further, we believe that a few general observations are in order. There is no dispute that RICO was intended primarily to deal with organized crime. This concern is reflected in the official title of the statute, "The Organized Crime Control Act," and in the Statement of Findings and Purpose of the Act which contains five points, all dealing exclusively with organized crime. *See generally*, Atkinson, *"Racketeer Influenced and Corrupt Organizations,"* 18 U.S.C. §§ 1961–68: *Broadest of the Federal Criminal Statutes,* 69 Journal of Criminal Law & Criminology 1, 9 (1978).

■ Much has been said and written about the statute since its enactment, and far more authoritative statements about its purposes and its reach are available than this opinion. Suffice it to say that it is clear to us that, by the greater weight of authority, RICO can reach far beyond organized crime to encompass less serious offenses.

This conclusion is supported by RICO's legislative history. Senators Hart and Kennedy, for example, opposed the act partially because "[t]he reach of this bill goes beyond organized crime activity. . . ." S.Rep. No.91–617, 91st Cong., 1st Sess. 215 (1969). Representative Poff, who served on the House sub-committee which considered RICO, stated on the House floor that,

[E]ven as to Titles of S. 30 needed primarily in organized crime cases, there are very real limits on the degree to which such provisions can be strictly confined to organized crime cases. . . . S. 30 must . . . stand or fall on constitutional questions without regard to the degree to which it is limited to organized crime cases.

*See* 116 Cong.Rec. 35344 (1970).

Such a broad sweep was found necessary because, in the words of Senator McClellan, chairman of the sub-committee which wrote the statute, "[i]t is impossible to draw an effective statute which reaches most of the commercial activity of organized crime, yet does not include offenses commonly committed by persons outside of organized crime as well." McClellan, *The Organized Crime Act (S. 30) or its Critics: Which Threatens Civil Liberties*?, 46 Notre Dame Lawyer 55, 143 (1970). This difficulty is compounded by the lack of consensus on a definition of the term "organized crime." Those words are not used to define "a precise and operative legal concept," but instead are used only as "a shorthand method of referring to a large and varying group of

---

5. As Gibson was acquitted on Counts X through XVI we must consider the present motion based upon the § 501(c) counts on which the jury did not reach a verdict, more specifically, Count II (Lake Ozark trip, May, 1975); Counts IV and V (conspiracy and substantive charges relating to June, 1975 Gaspe, Canada trip); Count VIII (Oakland-Sacramento, California trip, Nov., 1976); and Count IX (employment of Connie Jean (Brandel) Christiano, Dec., 1975–July, 1976).

offenses committed in diverse circumstances." *Id.* at 6.

The cases yield a similar conclusion. One of the few cases in which RICO is narrowly construed is *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109 (S.D.N.Y.1975). Referring to the legislative history, the court noted the repeated and continual use of words such as "syndicate" and "Mafia," and reasoned that only persons identified with such groups may be prosecuted under RICO. 66 F.R.D. at 113.

Appealing as such an approach might be on the facts of the instant case, however, we do not believe that the court in *Barr* correctly stated the law. The congressional history cited by the court there unquestionably evinces an intention to target such groups, but says nothing about what approach Congress may have found necessary. In our view, the history cited in *Barr* is in no way inconsistent with the conclusion that Congress chose to use a scattergun in order to hit its mark.

To the contrary, most courts have looked to the statutory language of RICO, and have found that the statute is not restricted to organized crime. In *United States v. Campanale*, 518 F.2d 352 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976), for example, the court noted that,

> There is no doubt that Congress was concerned with organized crime in passing this amendment to the Hobbs Act. . . . But quite obviously Congress focused on some of the kinds of activities by which individuals and associations engaged in organized crime maintained their income or influence. The statute, 18 U.S.C. § 1962, makes unlawful such activities no matter who engages therein.

518 F.2d at 363. The court concluded that "[t]he words of the statute are general. They contain no restriction to particular persons." *Id.* at 364. *Accord, e. g., United States v. Mandel*, 415 F.Supp. 997, 1018 (D.Md.1976), *reversed on other grounds*, 591 F.2d 1347 (4th Cir.), *reinstated*, 602 F.2d 653 (4th Cir. 1979) (*en banc*) ("highly unlikely that Congress . . . intended to make a conviction under the statute turn on a showing that the defendant was in some way a member of 'organized crime'"); *United States v. Amato*, 367 F.Supp. 547, 548 (S.D.N.Y.1973) (a defendant does not violate the statute by being "'reputed to be an organized crime member;'" rather, the crimes necessary to establish a pattern of racketeering must be proven).

█ It is against this background that we must reject Gibson's argument that RICO does not embrace the kind of "minor misconduct by a union official" at issue here, simply because the alleged offenses are not sufficiently "complex" or "significant." It should suffice here to reiterate that the statute can reach "any act which is indictable under [29 U.S.C. § 501(c)]." 18 U.S.C. § 1961(1)(C). Since for purposes of deciding this motion we must assume that Gibson is guilty of such acts, we must proceed to measure his conduct against RICO to determine whether the other elements of a § 1962(c) violation are present.

## A. PATTERN

Gibson's argument on this subject is simple and straightforward. He argues that the prosecution has shown only four violations of the same statute, a common perpetrator, and a common victim, and that this relationship alone is not strong enough to satisfy the pattern requirement.

The prosecution's argument also is straightforward. They point out that the evidence in this case reveals a common perpetrator (Gibson), a common victim (the Union), similar activities (use of the union plane and union funds for social and personal aggrandizement), and a common motive (to defraud the Union). These elements, the prosecution argues, comprise a pattern sufficient to withstand the instant motion.

█ We have concluded that the prosecution is correct on this score. Courts which have considered this issue generally have required some common scheme, plan or motive, and not simply a series of disconnected acts. One commentator points out, however, that "[p]robably no single test will

evolve to determine the presence of the necessary interrelationship between acts of racketeering activity." Atkinson, *supra* at 11. Courts will or have considered proximity in time of the acts in question, method of commission, commonality of participants, and similarity of victims. *Id.* *See also* the definition of "pattern of criminal conduct," as used in the title of the Organized Crime Control Act relating to special offenders, 18 U.S.C. § 3575, which provides that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

The pattern requirement probably received its narrowest reading in *United States v. DePalma,* 461 F.Supp. 778 (S.D.N.Y.1978). One of the defendants therein asserted that in order to meet the pattern requirement of § 1962(c), the acts of racketeering must be related to one another. Said the Court:

> The statutory definition of pattern of racketeering activity is unambiguous and contains no reference to any requirement of "relatedness." A review of the legislative history establishes that Congress was concerned with proscribing illegal activities of legitimate business, and that the only relation it deemed necessary for the two predicate acts is that they both be in the conduct of the affairs of the same enterprise. 18 U.S.C. § 1962(c) (1970).

Two significant amendments to the definition of pattern of racketeering, prior to the enactment of the statute, lend further support to this view. Prior to these amendments the definition was as follows: "The term pattern of racketeering activity includes at least one act occurring after the effective date of this chapter." S.Rep. No. 617, *supra* at 122. Since "the term 'pattern' indicates that what is intended to be proscribed is not a single isolated act of 'racketeering activity,' but at least two such acts" (*id.*) the statute was amended to read as follows: "The term 'pattern of racketeering activity' means at least two acts, one of which

occurred after the effective date of this chapter." Id. There was no requirement that the two acts be related to each other. In fact, at that point there was no requirement that the two acts even be related in time. This was the cause of some concern to those who commented on the proposed bill. *See, e. g.,* 116 Cong. Rec. S855 (daily ed. Jan. 22, 1970) (analysis of American Civil Liberties Union). Such concerns led to the enactment of the ten year limitation in the statute. It was this ten year limitation that provided any requirement of nexus between the two predicate acts. In its final form the statute simply required that the person commit at least two acts of racketeering activity within a ten year period.

Considering the time and effort spent by Congress on this definition, had it wanted to provide for any "relatedness", it had ample opportunity to do so. Instead Congress must have realized that the definition of "pattern of racketeering activity" would necessarily be interpreted in the context of the statute to which it applies (18 U.S.C. § 1962). Thus, the term "pattern", when used in this context, applies to the relationship of the acts to the enterprises, and no more. The definition of "racketeering activity" in the section and the additional definition of "pattern of racketeering activity," taken together, results in the conclusion that the "pattern" definition states a minimum but not necessarily an exclusive definition. A main focus of Title IX was the enterprise, not only the persons committing the acts, and Congress felt that the "pattern" would be supplied by this common factor.

*Id.* at 782–83.

The pattern requirement was given broader treatment in *United States v. Stofsky,* 409 F.Supp. 609 (S.D.N.Y.1973), wherein the Court construed § 1962(c) and § 1961 *in pari materia* with the definition of "pattern of criminal conduct" stated in 18 U.S.C. § 3575, *supra.* Concluding that § 3575(e) "may be used to cast light on the word 'pattern' as used in § 1961," the *Stofsky* Court stated:

This Court therefore construes the word "pattern" as including a requirement that the racketeering acts must have been connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts.[6]

For other examples of the treatment this issue has been given, see, e. g., United States v. Morris, 532 F.2d 436, 442 (5th Cir. 1976) (holding that several rigged card games which occurred over a 19 month period constituted a pattern); United States v. Fineman, 434 F.Supp. 189, 193 (E.D.Pa. 1977) (holding that acceptance of four bribes over a two and one-half year period from parents who wanted their children admitted to graduate school appeared to be a sufficient pattern to satisfy the statute).

For purposes of deciding the present motion we need not choose among these alternatives because in our view, even under the most expansive reading, the pattern requirement is met in this case. Uncontested evidence at trial revealed the elements of common perpetrator, enterprise, motive and method of commission, and proximity in time. Gibson's position on this matter therefore is rejected.

## B. CONDUCT OF UNION ACTIVITIES THROUGH OR BY MEANS OF RACKETEERING ACTIVITY

Alternatively, Gibson argues that the prosecution has failed to prove that he participated in or conducted the affairs of the union through the pattern of racketeering activity heretofore discussed. More specifically, Gibson argues that the prosecution has failed to sustain its alleged burden of proving that activities integral to the union's function were irregularly conducted or

perverted by virtue of his involvement in racketeering activity. See United States v. Ladmer, 429 F.Supp. 1231, 1243–44 (E.D.N.Y.1977).

For reasons somewhat different from those advanced by Gibson's counsel, we are in agreement that the prosecution has failed to produce any evidence whatsoever that the affairs of the union were conducted through the racketeering activity which is the subject of the instant indictment. Accordingly, judgment of acquittal must be entered on Count I. See United States v. Collon, 426 F.2d 939, 942 (6th Cir. 1970); United States v. Gaines, 353 F.2d 276 (6th Cir. 1965).

The Court in Ladmer, supra, gave § 1962(c) a restrictive interpretation which, in our view, is not supported by other decisions. Defendants there were charged with embezzlement and racketeering arising out of expenditures incurred in connection with conventions of the International Production, Service & Sales Employees Union [IPSSEU], held at the Foutainbleau Hotel in Miami in 1968, and at Hilton Hawaiian Village in 1970. Said the Court:

The Government presented no evidence to show that the activities integral to IPSSEU's and the Locals' essential functions in representing their members in collective bargaining negotiations, organizing non-union shops, and in the other essential union activities were irregularly conducted or were in any sense comprised in whole or in part of acts which could have come within the definition of racketeering activity in Section 1961(1). If the words of Section 1962(c) have their ordinary meaning, no evidence is here found which could in any specific sense

---

6. The DePalma court had this to say about Stofsky:

Although some of the language in Stofsky would support this position [that the acts of racketeering must be related to one another], the holding in the case does not go this far. In determining the constitutionality of 18 U.S.C. § 1962(c) the court in Stofsky stated that "[t]his Court therefore construes the word 'pattern' as including a requirement that the racketeering acts must have been

connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts." . . . But this should not mean that the acts themselves must be interrelated. The common scheme or plan must be supplied in each instance by the enterprise, in the conduct of whose affairs the acts must be committed.
461 F.Supp. at 784.

seem to show that the defendants had conducted or participated in conducting the affairs of the Union "through a pattern of racketeering activities."

429 F.Supp. at 1243.

While we are not prepared to go as far as the *Ladmer* court in restricting our interpretation of this portion of RICO, we do believe that the court there makes an important point: the plain words of the statute require participation in or the conducting of the enterprise's affairs *through* a pattern of racketeering activity, and the word "through" must be given content.

The most logical definition to ascribe to that word as used in the statute is, we think, "by means of, in consequence of, by reason of." *United States v. Nerone*, 563 F.2d 836, 851 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), *citing* Black's Law Dictionary 1652 (Rev. 4th ed. 1968). We do not understand the prosecution to dispute this.

Unfortunately, however, the prosecution has perverted the proof analysis. The prosecution has attempted to show only that Gibson engaged in a pattern of racketeering activity *through* the instrumentality of his union office, and not *vice versa*.

It must be remembered that the particular kind of racketeering activity alleged here is the misuse of the union aircraft, and the employment of a girlfriend who did not perform substantial union activity. Expenditures for operating the union aircraft and to compensate personnel would seem to be appropriate if they could be said to have been made on behalf of or for the benefit of the union. It is to the extent that they were truly *personal* expenditures and not sufficiently connected with the union's affairs that they become subject to challenge under § 501(c). *See United States v. Ladmer*, 429 F.Supp. at 1243.

7. As we already have stated, however, we do not suggest that the statute cannot reach far beyond these purposes. Nor do we suggest that RICO is limited in its reach to legitimate enterprises, a matter which is in doubt in this Circuit. *See United States v. Sutton*, 605 F.2d

Admittedly, the racketeering activity at issue here is connected to the operation of the union in the sense that Gibson would not have been able to accomplish the embezzlement of union funds but for his position with the union. We must presume, however, that had Congress desired to use RICO to prohibit all racketeering activity in connection with or through the instrumentality of a legitimate enterprise, it would have done so expressly. In this connection, it is pertinent that RICO's legislative history reveals a congressional intention to eradicate the infiltration of organized crime and racketeering into legitimate organizations, and not, in particular, to reach all racketeering activity which has any connection with a legitimate enterprise. *Atkinson, supra* at 12.[7]

It also should be considered that to adopt the prosecution's theory of the case would render RICO's enterprise element wholly redundant where the racketeering activity charged is embezzlement from a labor union. Since the labor union always would supply the necessary enterprise, the prosecution would be required to prove only two acts of embezzlement which satisfy the pattern requirement.

The problem with the prosecution's case, then, is that they have proven, at most, that Gibson conducted his *personal* affairs through a pattern of racketeering activity. By contrast, if the union is to supply the "enterprise" element of the statute, RICO would embrace only the conduct of the *union's* affairs through such racketeering activity. *United States v. Nerone*, 563 F.2d at 851. *See United States v. Mandel*, 591 F.2d 1347, 1375–76 (4th Cir.), *rev'd on other grounds on rehearing en banc*, 602 F.2d 653 (4th Cir. 1979).

Some light also may be cast on this problem by the Sixth Circuit's panel decision in *United States v. Sutton*, 605 F.2d 260, *rehearing en banc granted*, (Nov. 7, 1979).[8] The court there stated:

260 (6th Cir.), *rehearing en banc granted*, (6th Cir. Nov. 7, 1979).

8. The effect of the granting of a rehearing *en banc*, according to Sixth Circuit Rule 14, is to vacate the previous opinion and judgment of

Section 1962(c) is violated whenever any person associated with such an enterprise conducts its "affairs," *i. e.*, undertakes any activity on behalf of or relating to the purposes of the enterprise by committing at least two criminal acts constituting a "pattern of racketeering" as defined in section 1961(5).

605 F.2d at 270. Thus, in order to establish a RICO violation in this case, the prosecution must prove that activity "on behalf of or relating to the purposes of" the union was undertaken through a pattern of racketeering activity.

It should suffice here to reiterate our earlier conclusion that the acts of which Gibson stands accused are subject to challenge under § 501(c) (and hence under RICO) only because they were *not* on behalf of and did not relate to the purposes of the Union. *United States v. Ladmer*, 429 F.Supp. at 1243.

Accordingly, while the acts charged in Counts II, IV, V, VIII and IX may be reprosecuted as conspiracy and embezzlement from the Union, judgment of acquittal must be entered on Count I, owing to the total absence of any proof that the affairs of the Union were conducted through acts of racketeering.

### ORDER

This matter is before the Court on defendant John F. Gibson's motion for judgment of acquittal on Counts XVII and I of the instant indictment. *Fed.R.Crim.P.* 29(c). Defendant John F. Gibson, the General Secretary Treasurer of the Hotel and Restaurant Employees' and Bartenders' International Union, was the subject of an eighteen count indictment filed in March, 1979. Counts III and VII and part of Count I were dismissed prior to trial on the prosecution's motion. The remaining

charges were tried to a jury. At the conclusion of the prosecution's case, defense counsel moved for a judgment of acquittal on all the charges tried. *Fed.R.Crim.P.* 29(a). The Court took this motion under advisement, and the defendant presented his case. At the conclusion of all the evidence the Court denied the motion as to Counts II through XVI, but deferred decision as to Counts I, XVII, and XVIII. *Fed. R.Crim.P.* 29(b).

The jury returned verdicts of guilty on Count XVII, and not guilty on Counts IV, X through XVI, and XVIII. No verdict was returned on Counts I, II, III, V, VI, VIII, and IX, and the Court declared a mistrial as to these counts.

After the jury was discharged the Court ordered submission of memoranda of points and authorities to aid its determination on the remaining portions of the motion for judgment of acquittal. Oral argument also was allowed.

For the reasons stated in the Opinion filed simultaneously herewith, the Court concludes that judgment of acquittal must be entered both on Count XVII and on Count I. As to Count XVII, we find that the prosecution's method of proof was wholly inadequate, and that a jury which was adequately instructed on this highly technical area of law therefore could not have found guilt beyond a reasonable doubt. As to Count I, we conclude that the record is devoid of evidence that Gibson conducted the Union's affairs (as opposed to his personal affairs) through a pattern of racketeering, as the applicable statute requires. Here also, a jury adequately instructed on these difficult legal issues could not have concluded guilt beyond a reasonable doubt. Gibson's motion therefore is granted, and the jury's verdict of guilty on Count XVII is vacated.

So ordered.

the Court, to stay the mandate, and to restore the case on the docket as a pending appeal. Because there is no Sixth Circuit decision on this point, then, our task is to divine, as best we can, what would be the event of an appeal in the case before us. *Spector Motor Service, Inc. v. Walsh*, 139 F.2d 809, 823 (2d Cir. 1943)

(Hand, J., dissenting). Because we believe that the point for which we have cited *Sutton* is not inextricably intertwined with *Sutton's* more controversial conclusion that RICO embraces only legitimate enterprises, we look to *Sutton* for some guidance in the present case.

## ORDER

It has come to the Court's attention that our Opinion and Order on defendant's motion for judgment of acquittal, documents 70 and 71 respectively, contain several typographical errors in the summary of the jury verdicts in this case. More specifically, the Opinion and Order are incorrect in stating that the jury returned a verdict of not guilty on Count IV, and that the jury returned no verdict on Counts III and VI. Documents 70 and 71 hereby are amended to reflect that the jury returned a verdict of guilty on Count XVII; verdicts of not guilty on Counts VI, X through XVI, and XVIII; and that the jury reached no verdict on Counts I, II, IV, V, VIII, and IX, on which the Court declared a mistrial. Count III, VII, and part of Count I were dismissed prior to trial on the prosecution's motion.

So ordered.